No. 16-1999

---

IN THE

# United States Court of Appeals for the Federal Circuit

---

EMC CORPORATION, EMC INTERNATIONAL U.S. HOLDINGS, INC., VMWARE, INC.
*Appellants*,

*v.*

CLOUDING CORP.,
*Appellee*.

---

On Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2014-01309

---

**OPENING BRIEF AND ADDENDUM OF APPELLANTS EMC AND VMWARE**

---

Paul T. Dacier
Krishnendu Gupta
Thomas A. Brown
EMC CORP. &
EMC INTERNATIONAL U.S.
HOLDINGS, INC.
176 South Street
Hopkinton, MA 01748

Eric A. Shumsky
ORRICK, HERRINGTON &
SUTCLIFFE LLP
1152 15th Street NW
Washington, DC 20005
(202) 339-8400

Bas de Blank
Elizabeth R. Moulton
ORRICK, HERRINGTON &
SUTCLIFFE LLP
1000 Marsh Rd.
Menlo Park, CA 94025

*Counsel for Appellants*

## U.S. Patent No. 5,944,839: Claim 6

6. A method of optimizing a computer system, the method comprising the steps of:

detecting a problem in the computer system;

activating an AI engine in response to the problem detection;

utilizing, by the AI engine, selected ones of a plurality of sensors to gather information about the computer system;

determining, by the AI engine, a likely solution to the problem from the gathered information; and

when a likely solution cannot be determined, saving a state of the computer system.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

EMC Corporation **v.** Clouding Corp.

Case No. 16-1999

## CERTIFICATE OF INTEREST

Counsel for the:
☐ (petitioner) ☒ (appellant) ☐ (respondent) ☐ (appellee) ☐ (amicus) ☐ (name of party)

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| EMC Corporation | None | None |
| EMC International U.S. Holdings | None | EMC Corporation |
| VMware, Inc. | None | EMC Corporation |
| | | |
| | | |
| | | |
| | | |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

Orrick, Herrington & Sutcliffe LLP - Monte M.F. Cooper and Jason K. Yu

September 6, 2016
Date

/s/ Eric A. Shumsky
Signature of counsel

Please Note: All questions must be answered

Eric A. Shumsky
Printed name of counsel

cc: Counsel of Record

Reset Fields

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST .................... i
TABLE OF AUTHORITIES .................... iv
STATEMENT OF RELATED CASES .................... vii
INTRODUCTION .................... 1
JURISDICTION .................... 3
STATEMENT OF THE ISSUE .................... 3
STATEMENT OF THE CASE .................... 4
For Decades, Programmers Developed Artificial Intelligence Systems That Used Computers To Solve Problems .................... 4
The '839 Patent Applies Well-Known Artificial Intelligence Techniques To Diagnose Computer Problems .................... 10
Clouding Acquires And Asserts The '839 Patent; Appellants Petition For Inter Partes Review .................... 13
The Board Institutes Review, But Ultimately Confirms The Challenged Claims .................... 17
SUMMARY OF ARGUMENT .................... 21
STANDARD OF REVIEW .................... 25
ARGUMENT .................... 26
I. The Challenged Claims Are Obvious In View Of The Combination Of Barnett and Allen .................... 26
A. Barnett Undisputedly Teaches Steps 1-4 .................... 28
B. There Admittedly Was A Motivation To Upgrade Barnett's Rule-Based System With Allen's Integrated Rule- And Case-Based System .................... 30
C. The Prior Art Discloses Step #5's "Saving The State," And The Board Did Not Conclude Otherwise .................... 35

D. The Board Erroneously Reviewed Barnett And Allen Separately Rather Than In Combination, And On That Basis Found No Teaching Of Step #5's "When A Likely Solution [To A Problem In The Computer System] Cannot Be Determined." ........ 40

1. The Board Erred By Limiting Allen To Certain Embodiments, And Failing To Consider The Combination of Allen And Barnett ........ 42

2. The Board Further Erred By Analyzing Whether Barnett, In Isolation, Teaches "When A Likely Solution Cannot Be Determined." ........ 53

CONCLUSION ........ 61

ADDENDUM

PTAB Decision, dated January 29, 2016 ........ Appx1-16

U.S. Patent No. 5,944,839 ........ Appx17-23

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Applied Materials, Inc.*,
692 F.3d 1289 (Fed. Cir. 2012) ........................................ 35, 36, 47, 48

*Ariosa Diagnostics v. Verinata Health, Inc.*,
805 F.3d 1359 (Fed. Cir. 2015) ........................................................ 36

*Belden Inc. v. Berk-Tek LLC*,
805 F.3d 1064 (Fed. Cir. 2015) ........................................ 25, 26, 42, 47

*Duramed Pharm., Inc. v. Watson Labs., Inc.*,
413 F. App'x 289 (Fed. Cir. 2011) .................................................... 41

*EWP Corp. v. Reliance Universal Inc.*,
755 F.2d 898 (Fed. Cir. 1985) ................................................... 42, 47

*Graham v. John Deere Co.*,
383 U.S. 1 (1966) ............................................................................. 27

*In re Keller*,
642 F.2d 413 (C.C.P.A. 1981) ............................................ 3, 41, 44, 45

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) .......................................... 26, 27, 31, 33, 34, 41, 48

*In re Lamberti*,
545 F.2d 747 (C.C.P.A. 1976) ........................................................... 48

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.*,
485 F.3d 1157 (Fed. Cir. 2007) ................................................... 26, 33

*In re Lee*,
277 F.3d 1338 (Fed. Cir. 2002) ................................................... 36, 45

*In re Merck & Co., Inc.*,
800 F.2d 1091 (Fed. Cir. 1986) ........................................ 40, 41, 45, 54

*Merck & Co. v. Biocraft Labs., Inc.*,
874 F.2d 804 (Fed. Cir. 1989) .................................................... 47, 48

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)........................................................................ 45, 46

*In re Mouttet*,
686 F.3d 1322 (Fed. Cir. 2012) ......................................................... 26

*Nike, Inc. v. Adidas AG*,
812 F.3d 1326 (Fed. Cir. 2016) ......................................................... 46

*Power Integrations, Inc. v. Lee*,
797 F.3d 1318 (Fed. Cir. 2015) ......................................................... 45

*Randall Mfg. v. Rea*,
733 F.3d 1355 (Fed. Cir. 2013) ......................................................... 25

*In re Rouffet*,
149 F.3d 1350 (Fed. Cir. 1998) .................................................... 32, 33

*ScriptPro LLC v. Innovation Assoc., Inc.*,
__ F.3d __, No. 2015-1565, 2016 WL 4269920
(Fed. Cir. Aug. 15, 2016)............................................................. 48, 49

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947)............................................................................ 36

*Smith & Nephew, Inc. v. Rea*,
721 F.3d 1371 (Fed. Cir. 2013) ......................................................... 25

*In re Sullivan*,
498 F.3d 1345 (Fed. Cir. 2007) ......................................................... 46

*Syntex (U.S.A.) LLC v. Apotex, Inc.*,
407 F.3d 1371 (Fed. Cir. 2005) ......................................................... 48

*In re Young*,
927 F.2d 588 (Fed. Cir. 1991) ...................................................... 26, 60

**Statutes**

28 U.S.C. § 1295(a)(4)(A) .......... 3

35 U.S.C. § 103 .......... 26, 27, 60

35 U.S.C. § 141(c) .......... 3

Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) .......... 27

**Regulations**

37 C.F.R. § 90.3(a)(1) .......... 3

**Other Authorities**

*2001: A Space Odyssey* (Metro-Goldwyn-Mayer 1968) .......... 4

Donald S. Chisum, *Chisum on Patents* § 5.03[3][a][i] (2015) .......... 41

Isaac Asimov, *I, Robot* (Gnome Press 1950) .......... 4

U.S. Patent & Trademark Office, Manual of Patent Examination Procedure § 2145(IV) (9th ed. Rev. 7, Nov. 2015) .......... 41

## STATEMENT OF RELATED CASES

This appeal arises out of a proceeding before the Patent Trial and Appeal Board. There has been no prior appeal from this proceeding in this or any other appellate court. The challenged patent, U.S. Patent No. 5,944,839, is asserted in *Clouding Corp. v. EMC Corp.*, No. 14-cv-1178 (D. Del.), which may be directly affected by the decision in this appeal.

## INTRODUCTION

Sally the Sixth Grader is a good math student—good, but not perfect. Most nights, she finishes her math homework without help. Every so often, however, a problem stumps her; the principles she learned in class don't quite get the job done. She checks her notes and reviews the textbook to gather additional information. But still the solution eludes her, so she circles the problem, saves her work, and when she's completed the rest of her homework, she asks her mom for help.

That basic idea—if you encounter a problem you can't solve, make a note of it for later—is the supposed point of novelty in the patent at issue here. The challenged patent (U.S. Patent No. 5,944,839, now assigned to Clouding), is directed to a software program for diagnosing and fixing performance problems in computers. In the challenged independent claim, every limitation but one is concededly present in the prior art. The single contested limitation ("when a likely solution cannot be determined, saving a state of the computer system") discloses nothing more than what Sally does when a problem stumps her. When the software can't find the answer ("a likely solution") to a computer

problem, it notes the problem (by "saving a state of the computer system"). It does so for the same reason Sally circles her problem—to allow a human expert to review the problem and suggest a solution.

Given the obviousness of this invention, EMC Corporation, EMC International U.S. Holdings, Inc., and VMware, Inc. sought inter partes review of the '839 Patent. The Patent Trial and Appeal Board instituted review to consider obviousness in light of a combination of two references: patents issued to Barnett and Allen.

The dispute between the parties is narrow: whether Barnett and Allen teach the final limitation of claim 6 of the '839 Patent: "when a likely solution cannot be determined, saving a state of the computer system." In accepting Clouding's argument, the Board made a fundamental legal error (in addition to misreading the references). Specifically, it reviewed the prior art references in isolation rather than in combination. The final written decision did not consider whether Barnett (the base reference, which admittedly discloses every limitation but one) could be combined with Allen's clear disclosure of the modest step of saving-the-state-when-you-can't-solve-a-problem. The Board discusses Allen, and then separately discusses Barnett; in the Board's

final analysis, however, never the twain shall meet. This was error. "[O]ne cannot show non-obviousness by attacking references individually where, as here, the rejections are based on combinations of references." *In re Keller*, 642 F.2d 413, 426 (C.C.P.A. 1981). The Board's determination of nonobviousness should be overturned.

## JURISDICTION

This is an appeal from a final decision of the Patent Trial and Appeal Board of the United States Patent and Trademark Office. The Board issued its final written decision on January 29, 2016. Appx1. On March 25, 2016, Appellants timely filed their notice of appeal. 35 U.S.C. § 141(c); 37 C.F.R. § 90.3(a)(1). This Court has jurisdiction under 35 U.S.C. § 141(c) and 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUE

Clouding's '839 Patent claims an artificial intelligence system that diagnoses computer performance problems and, when it encounters a new problem, saves information about the computer system for human review. One prior art reference, Barnett, teaches an artificial intelligence system for diagnosing computer problems. A second, Allen,

teaches an improved artificial intelligence system that saves difficult problems for human review.

Did the Board err when it considered Barnett and Allen separately rather than in combination, determined that each on its own fails to teach the single purportedly missing element of the ’839 Patent (Allen, because it purportedly does not address problems in computers; Barnett on the theory that it always has a likely solution), and on that basis reached a determination of nonobviousness?

## STATEMENT OF THE CASE

### ***For Decades, Programmers Developed Artificial Intelligence Systems That Used Computers To Solve Problems.***

“Artificial intelligence” (or AI) is commonly portrayed as the stuff of science fiction,[1] but the reality is a bit more mundane. At issue here is the ’839 Patent, and by the time it was filed in 1997, AI programs were an everyday part of the computer world. Appx804-05 (Riesbeck, *Inside Case-Based Reasoning*) (describing the widespread use of AI in the early 1980s in business, psychology, linguistics, and other disciplines). Computer programmers were writing programs that could

---

[1] *See, e.g.*, Isaac Asimov, *I, Robot* (Gnome Press 1950); *2001: A Space Odyssey* (Metro-Goldwyn-Mayer 1968).

do more than "give arithmetic answers to arithmetic problems"—AI systems could apply general reasoning to solve new problems. Appx804-05, 808 (Riesbeck); *see also* Appx525-30 (Sacerdoti Decl.) (describing the "wide variety" and advanced stage of AI systems by 1997).

To understand how the '839 Patent and the prior art fit into this world, it is necessary to know something about how AI systems work. The types of AI systems at issue here have two principal components: a "knowledge base" and an "inference engine." Appx525. Think of them as the memory and the brain; one stores information, and the other reasons from it. The knowledge base is the memory. It stores information about a particular area, or "domain." *Id.* A domain can be broad, encompassing an entire field (like landscape design), or narrow, for solving a particular problem (like how to place ceramics in a kiln for baking). Appx603 (discussing these examples). The inference engine is the brains of the operation—it is a computer program that "examines data about a particular problem case and applies the knowledge from the knowledge base to develop a solution." Appx525.

Early AI systems developed in the 1970s were "rule-based" systems. *See* Appx808-09. Such systems are premised on the idea "that the knowledge of an expert can be embodied in a set of rules." Appx809. Imagine, for instance, a traveler booking a flight from Washington, D.C. to San Francisco. The traveler's mental process could be captured in a set of rules (which are commonly written in if-then form). For instance, "if a direct flight costs at least $100 more than a connecting flight, then book the connecting flight." Additional rules could refine the choices—"if the connection is more than two hours long, then book the connecting flight only if the cost differential is more than $200"; "if a flight from Dulles costs at least $150 more than a flight from Baltimore, then book the flight out of Baltimore"; and so on.

The set of rules, once programmed into the AI system, makes up its knowledge base. Appx838. Those rules can be used by the inference engine to find answers to problems that are presented to it. Appx837-38. The more rules in the knowledge database, the more expert the system. Appx809.

By the mid-1980s, however, researchers recognized shortcomings in rule-based systems. Appx526, 838. In particular, it quickly becomes

difficult to describe even relatively simple situations using only if-then rules. Appx838. Think about the flight-planning example. A traveler may wish to avoid rush hour, to favor (or disfavor) certain airports (maybe always; maybe just under certain circumstances), to limit the length of a layover (or to build in a layover in certain favorite cities), to express preferences for airlines, and so on. Each one of these situations requires a new rule, and each permutation of these situations in combination could require additional new rules.

To address such shortcomings, computer programmers improved upon rule-based systems with "case-based" reasoning. Appx528, 816. A case-based system better reflects how humans solve problems: by comparing a new problem to actual past experiences. Appx598, 833, 839.

Like a rule-based system, a case-based system contains a knowledge database and an inference engine. The knowledge database is comprised of "cases" rather than "rules." Appx528. The cases are descriptions of prior problems and their associated solutions. The important features of each case are labelled (in AI terms, "indexed") so that the inference engine can identify which cases are relevant to a new

problem. Appx839-40. In the flight-planning example, each past trip would be a case, and these cases would be indexed by features like airport, time of day, airline, and price.

The inference engine in a case-based system is also a bit different. Whereas "rule-based reasoning … solves problems by chaining [together] rules," a case-based system solves new problems by searching the knowledge database for similar problems. Appx832 (Riesbeck textbook). It will "reject cases that are too different" from the current problem; "determine which of the remaining cases is most similar"; and then modify the solutions stored in the most similar cases to account for differences between the past cases and the current problem. Appx840; *see also* Appx832 (a case-based system's AI engine adapts prior solutions "to fit the current problem, taking into account any difference between the current and previous situations").

"Sometimes, what was done in a previous case will be the right thing to do again. Other times, simple alterations need to be done." Appx840. In still other circumstances, the selected case may be such a poor match to the current problem that the inference engine will be unable to adapt its knowledge to derive a solution. "When this

happens, the [case-based reasoner's] best plan is to ask a human expert [to] solve the problem and save the answer in the case library for future use." *Id.*

Case-based systems represented an improvement over rule-based systems. That is because "[c]ase-based reasoning allows the reasoner to propose solutions to problems quickly, avoiding the time necessary to derive those answers from scratch." Appx623. Whereas rule-based systems are static, case-based systems "can autonomously adapt their set of cases over time based upon the success or failure of their attempts to solve problems."[2] So for our San Francisco-bound traveler, past experience would tell her that the nonstop 8:30 a.m. United Airlines flight out of Washington National to SFO is the best choice—on prior trips, the timing of the flight allowed her to avoid rush hour on both ends, and the price was right. Conversely, she now knows to avoid the 5:15 p.m. American Airlines flight from Baltimore to Oakland—traffic was terrible around the Beltway, and the connection in Phoenix added

---

[2] Appx527; *see also* Appx624 ("Remembering previous experiences is particularly useful in warning of the potential for problems that have occurred in the past, alerting a reasoner to take actions to avoid repeating past mistakes.").

hours to the trip. By using case-based reasoning, the traveler (and an AI engine) can avoid working through innumerable rules about departure airports, destination airports, times of day, airlines, and the like.

Because of its flexibility and more sophisticated analysis, case-based reasoning was recognized as a more natural way to think about problems, adapt to new information, and arrive promptly at a helpful solution. Thus, by the early 1990s, case-based AI systems were well understood and widely used. Appx528.

***The '839 Patent Applies Well-Known Artificial Intelligence Techniques To Diagnose Computer Problems.***

The '839 Patent (Appx17-23) uses these familiar case-based reasoning techniques to diagnose problems in a computer system. *See* Appx21, col. 1:57-59 (describing "a computer utility that uses a set of sensors in combination with [a] case base to diagnose and solve computer system problems").

At the time the application for the '839 Patent was filed in 1997, AI systems were already being used to address problems in computers. *See, e.g.*, *id.* col. 1:26-27; Appx1663-72 (Nov. 1993 paper describing case-based computer network management and noting "quite a few rule-

based expert systems for network fault diagnosis"). Consistent with the technology described above, the inventor sought to have a case-based AI system "learn from the results of prior diagnoses and solutions and apply that learned knowledge to future computer system problems." Appx21, col. 1:48-50; *see generally* col. 1:29-50 (describing prior art systems and benefits of the invention).

The inventor sought to achieve these goals using common tools. The AI system runs on "a conventional personal computer or workstation having conventional hardware components such as processor, a memory, a storage device, a network connection, a display, a keyboard, and an input device, such as a mouse." *Id.* col. 2:44-48 (numbering omitted).

In operation, too, the claimed AI engine is conventional. Claim 6, the only independent claim at issue,[3] requires:

> A method of optimizing a computer system, the method comprising the steps of:
>
> [1] detecting a problem in the computer system;

---

[3] Review also was instituted on claims 8 and 14; the parties and the Board (Appx15) treated all three claims as rising or falling together.

> [2] activating an AI engine in response to the problem detection;
>
> [3] utilizing, by the AI engine, selected ones of a plurality of sensors to gather information about the computer system;
>
> [4] determining, by the AI engine, a likely solution to the problem from the gathered information; and
>
> [5] when a likely solution cannot be determined, saving a state of the computer system.

Appx23, col. 5:58-6:4 (bracketed numbers added); *see also* Appx19, Fig. 2 (flowchart depicting how the invention works).

In short, the invention contains sensors (Step 3), which are "software programs that gather information from the computer system." Appx22, col. 3:16-17. The sensors monitor the computer (in Step 1) for problems such as "a fragmented file," "an incorrect video driver," or "a poorly configured memory manager." *Id.* col. 3:1-6. If a sensor detects a problem, the system (in Step 2) activates a diagnostic software program, which the '839 Patent refers to as its "AI engine," *id.* col. 4:46-59—the equivalent of the inference engine described above (at 5). To find a solution, the AI engine uses (in Step 4) a "knowledge database" that "contains 'cases' describing computer problems and solutions." *Id.* col. 3:46-47. The cases are "derived from knowledge held by experts

having backgrounds in troubleshooting and maintaining computer system environments." *Id.* col. 3:63-66.

None of the steps described thus far were new, and Clouding has not said that they were. So while the inventor had made sweeping claims about the invention, *e.g.*, Appx21, col. 1:44-46, 47-50, 51-53, the supposed point of novelty is found in a single, modest step at the end of the process: Step 5. As the specification puts it, if the AI engine "has gathered all possible data and still does not have a solution to the computer problem," then the system will "sav[e] a state of the computer system." Appx22, col. 4:66-67; Appx23, col. 6:3-4. This permits the information to "be examined by a human computer expert." Appx22-23, col. 4:66-5:7. Simply put: If the AI engine cannot solve the problem, it will save the data the system has gathered about the computer problem so that a human can take a look. "Presumably, the human expert can then solve the computer problem and add the solution to the knowledge database 114." Appx23, col. 5:4-8.

***Clouding Acquires And Asserts The '839 Patent; Appellants Petition For Inter Partes Review.***

Clouding acquired certain rights to the '839 Patent from Symantec and asserted them in multiple lawsuits beginning in 2012. *See* Appx62

(listing cases). None of the cases reached a decision on the validity of the ’839 Patent; all but one settled or was dismissed for lack of standing. The remaining suit is against the two EMC entities and VMware,[4] which we refer to collectively, and solely for ease of reference, as “EMC.” EMC petitioned for inter partes review, *see* Appx53 (Petition), and the Board instituted review to consider whether claims 6, 8, and 14 are obvious over a combination of two references: (1) U.S. Patent No. 5,664,093 to Barnett, in light of (2) U.S. Patent No. 5,581,664 to Allen.[5] *See* Appx205-08. Both references, like the ’839 Patent, disclose artificial intelligence technology.

Barnett (Appx488-96) teaches an AI program (which the patent calls a “fault diagnosis system”) that diagnoses problems on a computer network (a “distributed system”). Appx493, col. 2:35-36, 51-54. As a rule-based system, it includes a database of rules. Appx494, col. 4:8-10. The rules are particular to the computer network being analyzed, and they must be updated when new types of components are added to the

[4] *Clouding Corp. v. EMC Corp.*, 14-cv-1178 (D. Del.).

[5] The parties below referred to Allen as “Allen ’664” because two Allen references were initially at issue. Appx65, 77. Because only the Allen ’664 patent remains at issue, we refer to it simply as “Allen.”

network. *Id.* col. 4:30-35. In addition, a set of sensors ("measurement agents") is used to "obtain performance information" about the computer system being assessed. Appx493, col. 2:58-60. That information then is evaluated using the rules in the rule database, and in that way, "the diagnostic system is able to monitor performance and diagnose several types of failures that are reported from any of the plurality of measurement agents." Appx494, col. 4:10-14; *see also id.* col. 3:1-2 (the system can "identify faults and provide solutions for any faults"); Appx495, col. 5:3-8 (example of rule). If desired, the system can give a more "precise" solution to a problem if an expert programs "additional rules" into the database. Appx495-96, cols. 6:64-7:3. Without such additional rules, Barnett's system would "identify performance problems to a coarse level." Appx496, col. 7:4-6.

The second reference, Allen, also discloses an AI engine. Appx497-519. Allen recognized the trend toward case-based artificial intelligence systems, and so taught a system that added case-based to rule-based features.[6] Allen's system gathers information about a

[6] *See, e.g.*, Appx497 (Abstract); Appx512, col. 1:15-55 ("The invention provides a case-based reasoning system which is smoothly integrated

problem, which it compares to information in its knowledge databases. Appx512, col. 2:45-60; *see generally* Appx500-01 (Figs. 1, 2); Appx512 col. 2:48-51. Specifically, an inference engine "retrieves a description of the facts of a particular situation (the 'problem')" from a problem database. Appx513, col. 3:59-61. The inference engine then searches its knowledge databases (i.e., its case base and rule base) to find a "best case" to match the problem. *Id.* col. 4:4-6. If the "best case" offers a solution, the inference engine implements it, *id.* col. 4:11-16; if not, the system saves the state by creating a "new case" in the problem database which will contain information describing the problem. *Id.* col. 4:17-22; Appx515, col. 8:22-30. It does this so that the AI system "may solicit human advice for treatment of new problems which are not already well-treated by the case base. Thus, the processor may 'learn' how to … do its job on a dynamic basis." Appx512, col. 2:13-16.

In its petition, EMC explained that it would have been obvious to upgrade the rule-based, computer-diagnosis system of Barnett with Allen's improved AI system to arrive at claim 6 of the '839 Patent.

---

into a rule-based reasoning system, thus coordinating case-based reasoning techniques and rule-based reasoning techniques in a unified automated reasoning system.").

Appx112-18 (Petition); Appx580-86 (Sacerdoti discussing combination of Barnett and Allen). Such a combination would be desirable, as the prior art reflected and EMC's expert, Dr. Earl Sacerdoti, explained. Both references recognized that their AI systems could be improved by building up their knowledge databases. Appx496, col. 7:1-6 (Barnett); Appx512, col. 2:3-16 (Allen). Allen's system was expressly designed to be combined with a rule-based system, like Barnett, and Allen further explained how an AI system could be improved by having a human expert add solutions to difficult problems. *See, e.g.*, Appx497 (Abstract); Appx512, cols. 1:34-36, 2:1-16. Thus, "a skilled artisan would be motivated to combine the teachings of Barnett and Allen '664 because Allen '664's case-based reasoning system could be easily substituted for the rule-based AI engine described in Barnett" and Allen's system "would provide additional advantages over Barnett's simple rule-based approach." Appx581-82 (Sacerdoti Decl.).

***The Board Institutes Review, But Ultimately Confirms The Challenged Claims.***

Recognizing the straightforward logic of upgrading Barnett with Allen, the Board instituted review of claims 6, 8, and 14. Appx205. The Board agreed that "a skilled artisan would be motivated to combine the

teachings of Barnett and Allen ’664 for several reasons, including that Allen ’664’s case-based reasoning system could be easily substituted for the rule-based AI engine described in Barnett.” Appx206. Analyzing that combination, the Board found “a reasonable likelihood that it was known that an effective means of enabling the debugging and improvement of almost any software program was to save the state of the computer system when a failure occurred.” *Id.*

Clouding’s limited response conceded most of the obviousness inquiry. Appx244-52. Clouding did not submit any expert testimony, and introduced no evidence of secondary considerations. Clouding did not dispute Dr. Sacerdoti’s expertise or his conclusions that one would be motivated to combine Barnett and Allen. On the contrary, Clouding agreed that one of ordinary skill would be motivated to do so: “Allen ’664 teaches the person of ordinary skill in the art how to integrate rule-based systems (such as that described by Barnett) with case-based systems.” Appx246. Clouding acknowledged that Allen discusses how and why to integrate case-based and rule-based artificial intelligence systems. *See* Appx246-47 (Patent Owner Response, citing Appx512, col. 1:30-37 (Allen)). And it conceded that combining Barnett

and Allen "*would be advisable* for the person of ordinary skill in the art." Appx246 (emphasis added).

The Board, however, ultimately concluded that EMC had not established the obviousness of claims 6, 8, and 14. Appx1-16 (Final Written Decision). Because these factors were not disputed, the Board did not address the level of ordinary skill in the art; the motivation to modify or combine prior art; or any objective indicia of nonobviousness. *See generally* Appx9-14. Instead, the Board found one claim element missing from the prior art. But in so doing, and despite an earlier acknowledgement by the Board that Barnett and Allen must be considered in combination, *see* Appx207, the Board looked at the references in isolation.

It began its analysis of claim 6 by looking at Allen alone, without considering how Barnett and Allen would be combined. Appx7-9. The Board focused on the '839 Patent's limitation "when a likely solution cannot be determined, saving a state of the computer system." Appx7 (quoting Appx23, col. 6:3-4). The Board said that Allen does not address problems in computer systems, without considering whether *Barnett* does so, or whether a combination would do so. As to Allen itself, EMC

noted during the oral hearing that Allen includes two examples that are not specific to computer systems—but repeatedly explained that Allen is not limited to those embodiments. The Board, however, took that (correct) description of Allen, and recast it as waiving any argument that Allen's generic technology can operate in the context of problems in computer systems. Appx8.

The Board then turned its attention to whether Barnett discloses the contested limitation. It performed that analysis without ever once mentioning Allen. Appx9-14. Barnett, as the Board recognized when summarizing the prior art, does apply to computer problems, and does so explicitly. Appx5-6. According to the Board, however, Barnett has a different failing from Allen—it never "contemplate[s] the condition" "when a likely solution cannot be found." Appx9. In short, the Board read Barnett as always having an answer to any problem arising in a computer system.

Notably, the Board did not consider whether the *combination* of Barnett and Allen teaches the final limitation of claim 6. The Board did not dispute (or even address EMC's showing) that Allen's AI system will save a "new case" when it encounters a problem without a likely

solution in its knowledge bases. *See* Appx6-9 (Final Written Decision discussing Allen); Appx513, col. 4:11-23 (Allen describing saving a new case when no "best case" can be found); Appx571 (Sacerdoti). At no point did the Board consider how Barnett and Allen could be combined. Just as its discussion of Allen never considered any combination with Barnett, *see* Appx8-9, its discussion of Barnett never mentioned Allen, *see* Appx9-14. Having concluded that neither reference by itself taught the entirety of Step #5, the Board confirmed the claims. Appx15.

## SUMMARY OF ARGUMENT

The '839 Patent claims an artificial intelligence program for diagnosing computer problems. The asserted point of novelty is that, when the program confronts a problem with no likely solution, it saves information about that problem. The specification explains that the purpose of saving this information—saving "the state" of the computer system—is to allow a human to find a solution. Taken together, Barnett and Allen—two complementary AI systems—teach exactly that.

**I.A.** Barnett is the primary reference and it, like the '839 patent, is an AI system for diagnosing computer problems. It undisputedly teaches four of the five steps of Claim 6, the representative claim.

**I.B.** Allen is an improved AI system that builds on traditional rule-based systems, like Barnett, to make them more flexible and adaptable. EMC's expert and Clouding agreed that there was a motivation to combine Barnett and Allen. That admission was with good reason: There was ample evidence that it would have been obvious to apply Allen's teachings (i.e., saving information about problems for which no solution can be determined) to Barnett's computer diagnostic system. Both patents deal with artificial intelligence systems, and suggest improving their knowledge databases by adding new rules or cases. The record reveals a history of using ideas from case-based systems (such as Allen) to improve rule-based systems (such as Barnett). One of ordinary skill would have been motivated to upgrade Barnett's rule-based computer diagnosis system with the integrated rule- and case-based system of Allen.

**I.C.** The only part of claim 6 in dispute was Step #5, "when a likely solution cannot be determined, saving a state of the computer system." The Board did not deny that the prior art teaches the latter part of this step, "saving a state of the computer system." When Allen's system encounters a problem it cannot solve, it does the same thing as

Step #5—it makes a note of the problem and saves information about it. Indeed, it does so for the very same (unclaimed) reason as the ’839 Patent: so that a human expert can review the problem. When Allen’s system is applied to computer problems, as taught by Barnett, it would “sav[e] a state of the computer system.”

**I.D.** The Board found nonobviousness because it erroneously reviewed the references piecemeal. The Board analyzed whether Barnett or Allen individually teaches Step #5, and concluded that they do not, but never addressed whether the combination does so, much less how one of ordinary skill in the art would read the references together.

First, the Board considered whether Allen by itself determines a “likely solution” to a problem in a computer system. The Board erred in limiting its analysis to Allen. *Barnett* is all about solving problems in computer systems—the word “computer” appears some 10 times in the first paragraph describing the invention—a point that Clouding never disputed.

Moreover, Allen also can be used in computer systems. Allen speaks in generic terms about the uses of its invention, and never limits its AI engine to particular domains, much less does it exclude computer

systems. Concluding otherwise would erroneously limit Allen to two "examples" in the specification, contrary to the black-letter rule that a patent is not limited to its embodiments. Ultimately, the Board's conclusion rested on a belief that EMC waived reliance on Allen at oral argument. EMC did no such thing. Allen is and has been a centerpiece of EMC's arguments, as any fair reading of the transcript confirms. *Infra* § I.D.1.

The Board then turned to Barnett, which it treated in equally narrow fashion. The Board considered whether Barnett alone discloses "when a likely solution cannot be found," and concluded that Barnett's AI system never encounters a problem for which it has no "likely solution." But it ignored the fact that *Allen* plainly teaches that condition. Allen teaches an AI system that encounters difficult problems for which it does not have likely solutions, saves those problems, and then asks a human expert for a solution. The Board did not dispute (nor even address) this point.

In addition to ignoring Allen, the Board was wrong about Barnett. Barnett did not purport to invent an omniscient AI system that can diagnose any computer problem. On the contrary, Barnett is clear that

when new components are added to its system, new rules also are required. Expert testimony made clear that absent such rules, a likely solution cannot be found. Clouding offered only attorney argument in response, and the Board ignored the expert testimony. In so doing, the Board again impermissibly focused on a single embodiment. *Infra* § I.D.2.

## STANDARD OF REVIEW

Whether an invention is obvious is a legal conclusion based on underlying findings of fact. *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015). The Court "review[s] the Board's compliance with governing legal standards de novo and its underlying factual determinations for substantial evidence." *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013). The Court also reviews de novo "analytical errors" that do not rest on "the Board's resolution of factual questions." *Smith & Nephew, Inc. v. Rea*, 721 F.3d 1371, 1380 (Fed. Cir. 2013) (reversing finding of nonobviousness); *Belden*, 805 F.3d at 1075 (reversing Board and finding claims obvious because, "[e]ven giving the Board the deference it is due under the substantial-evidence

standard of review of factual findings," the Board's finding of nonobviousness "rests on legal errors.").

## ARGUMENT

### I. The Challenged Claims Are Obvious In View Of The Combination Of Barnett and Allen.

"The test for obviousness is what the combined teachings of the references would have suggested to one of ordinary skill in the art." *In re Young*, 927 F.2d 588, 591 (Fed. Cir. 1991); *In re Mouttet*, 686 F.3d 1322, 1333 (Fed. Cir. 2012). The obviousness analysis is "not the result of a rigid formula disassociated from the consideration of the facts of a case," *Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1161 (Fed. Cir. 2007), nor does it "seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ," *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). Rather, the obviousness inquiry asks whether the subject matter of the invention—taken "as a whole," 35 U.S.C. § 103(a)

(2004)[7]—would have been obvious to one of ordinary skill in the art. *See KSR*, 550 U.S. at 406.

Here, that analysis is uncommonly simple. Clouding did not dispute most of the obviousness inquiry. *See* Appx236-53 (Patent Owner Response). Clouding did not dispute that the two references were analogous prior art; did not dispute the level of ordinary skill in the art; did not submit expert testimony or attempt to establish any secondary considerations; and did not dispute that there was a motivation to combine the two references. *See generally Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966) (identifying factors relevant to obviousness); *KSR*, 550 U.S. at 406 (same).

As to the "scope and content of the prior art," *Graham*, 383 U.S. at 17, the analysis is simple too. A single reference (Barnett) undisputedly teaches four of the five limitations. There was an undisputed motivation to combine Barnett with a second reference (Allen). When Barnett and Allen are combined, they teach the fifth and final

[7] The Leahy-Smith America Invents Act amended § 103. Pub. L. No. 112-29, § 3(c), 125 Stat. 284, 287 (2011). Because the application that led to the '839 Patent was filed before March 16, 2013, the pre-AIA version of § 103 applies here. *See id.* § 3(n)(1), 125 Stat. at 293.

limitation. We begin with this textbook case of obviousness, *infra* §§ A-C, before turning to how the Board's separate treatment of the individual references led it to a legally erroneous result, *infra* § D.

**A. Barnett Undisputedly Teaches Steps 1-4**

The '839 Patent claims an artificial intelligence system that detects and diagnoses computer problems. *See* Appx17 (Abstract). Such systems were well known in the art, as the inventor himself recognized: "[V]arious companies have developed software utilities that automate computer system maintenance." Appx21, col. 1:25-27; *see also* Appx1663-72 (Nov. 1993 paper describing case-based and rule-based AI systems for managing computer networks). Among the many references preceding the '839 Patent were Barnett and Allen, both of which disclose artificial intelligence software programs for diagnosing and solving problems. Appx488-96 (Barnett); Appx497-519 (Allen).

It comes as little surprise, then, that Barnett teaches every claim limitation but one—a fact as to which there was no dispute.[8] That is

[8] *See, e.g.*, Appx158-59 (Patent Owner Preliminary Response) (arguing only that the combination would not "save computer state, as required by claim 6"); Appx245 (Patent Owner Response) (arguing solely about whether the combination of Barnett and Allen would "yield a solution

because the AI systems taught by Barnett, and later by the ’839 Patent, function in fundamentally similar ways. Like the ’839 Patent, Barnett uses an AI system to diagnose computer problems. *See* Appx493-94, cols. 2:58-3:2, 4:8-14. Its AI system contains the familiar elements—a rule base (the memory) and an inference engine (the brain). *See* Appx490, Fig. 2, elements 32 and 34.

It also contains sensors (“measurement agents”) that monitor the computer. Appx493, col. 2:58-60. When a sensor reports a problem, Appx495, col. 5:25-27, the AI engine begins searching for a solution, *id.* col. 5:37-40. The AI engine uses the sensors to gather information about the problem. *Id.* col. 5:47-50. Then, “[u]sing the rules in the rule base, the diagnostic system can identify performance problems and provide solutions for overcoming faults and sluggish performance of” the computer. *Id.* col. 5:54-57. Thus, in the words of claim 6 of the ’839 Patent, Barnett discloses:

---

that involves saving the state of a computer system”); Appx296-97 (Patent Owner Observation) (agreeing that Allen would create a new case, but disputing that Allen would save the state of the computer system).

| Claim 6 | Disclosure in Barnett |
|---|---|
| A method of optimizing a computer system, the method comprising the steps of: | Appx488 (Abstract) |
| [1] detecting a problem in the computer system; | Appx495, col. 5:24-27 |
| [2] activating an AI engine in response to the problem detection; | Appx495, col. 5:24-37 |
| [3] utilizing, by the AI engine, selected ones of a plurality of sensors to gather information about the computer system; and | Appx493, col. 2:56-60; Appx495, col. 5:47-50 |
| [4] determining, by the AI engine, a likely solution to the problem from the gathered information | Appx493-94, cols. 2:51-3:9; Appx495, col. 5:47-57 |

*See* Appx23, cols. 5:58-6:2 ('839 Patent claim 6, brackets and numbering added); Appx112-16 (claim chart submitted in conjunction with petition).

### B. There Admittedly Was A Motivation To Upgrade Barnett's Rule-Based System With Allen's Integrated Rule- And Case-Based System.

Next, there was a clear motivation to add Allen to Barnett. While a motivation to combine prior art elements is not a requirement of

obviousness, the existence of such a motivation may be helpful in showing that the invention is obvious. *See KSR*, 550 U.S. at 419-20. Here, it was undisputed that just such a motivation was present.

Barnett, as just described, is a traditional rule-based AI system. Barnett itself recognizes that its system can be improved by adding additional rules. Specifically, Barnett suggests programming additional rules to derive a more precise solution, Appx496, col. 7:4-6, to address new components added to the system, Appx495, col. 6:39-44, or to determine relationships among components, *id.* col. 5:42-46, 54-56. Barnett does not disclose any particular method of adding new rules.

Allen is meant to work with a system like Barnett's. It is a "case-based reasoning system which is smoothly integrated into a rule-based reasoning system, thus coordinating case-based reasoning techniques and rule-based reasoning techniques in a unified automated reasoning system." Appx497 (Abstract). Allen is not limited to any particular field, whether computers or otherwise; it is broadly applicable to improving any rule-based system. Appx512, col. 2:45-46 (describing how Allen applies to a generic "application field" or domain).

It does so by overcoming the "natural drawback[s]" in rule-based systems. *Id.* col. 1:25. In those systems, maintaining the rule base "often requires a substantial amount of time and effort, by both computer software engineers and experts in the particular field of application, to produce a useful product." And, "once a rule-based system has been constructed based on the knowledge of a human expert, it may be difficult to accommodate [c]hanges in the field of operation in which the processor must operate." *Id.* col. 1:26-29, 34-37. Thus, Allen proposed a system that is able to "dynamically adapt[]" and "learn" on an ongoing basis. *Id.* col. 2:3-16 (explaining the benefits of case-based reasoning); Appx527 (Sacerdoti) (same). Allen's system "may solicit human advice for treatment of new problems which are not already well-treated by the case base. Thus, the processor may 'learn' how to … do its job on a dynamic basis." Appx512, col. 2:13-16.

After reading Allen's discussion of how and why to add new cases to an AI system, a person of ordinary skill would be motivated to upgrade Barnett's rule-based system with the integrated and adaptable rule- and case-based system of Allen. *See, e.g., In re Rouffet*, 149 F.3d 1350, 1355 (Fed. Cir. 1998) (suggestion to combine "more often comes

from the teachings of the pertinent references"). As Dr. Sacerdoti explained in unrebutted testimony, one of ordinary skill in the art would read Barnett's instruction that a more precise AI system can be created by adding more rules. She would observe that this can be accomplished using Allen's method of saving a problem, thereby improving Barnett's system. Appx569-70, 2335-36. *Cf. Leapfrog*, 485 F.3d at 1162 (finding obvious "the adaptation of an old idea or invention ([Barnett]) using newer technology that is commonly available and understood in the art ([Allen])."). Taken together, the references suggest improving Barnett's system with Allen's teaching about saving the problem and "solicit[ing] human advice." Appx512, col. 2:13.

In addition, the very reason that Allen gave for saving problems is the same one given by the applicant for the '839 Patent when explaining why his amended claims were allowable: "An advantage of the claimed behavior is that a human expert can later examine the case and input a likely solution." Appx424. This, too, is strong evidence of a motivation to combine: "[A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR*, 550 U.S. at

420; *id.* at 417 ("if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond that person's skill").

Far from contesting a motivation to combine, Clouding conceded that it "would be advisable for the person of ordinary skill in the art" to combine Barnett and Allen. Appx246 (Patent Owner Response). Clouding acknowledged that Allen itself "teaches the person of ordinary skill in the art how to integrate rule-based systems (such as that described by *Barnett*) with case-based systems." *Id.* This is because, as Allen explains, "[r]ule-based systems of [the type described in Barnett] present a difficult programming task." Appx247 (quoting Appx512, col. 1:30-31 (Allen)). A case-based system, on the other hand, is able to "dynamically adapt[]" and "learn" on an ongoing basis. Appx512, col. 2:3-16 (explaining benefits of case-based reasoning); Appx527 (Sacerdoti) (same). Accordingly, Clouding admitted, "it would be advisable" to "follow the directions of [Allen] with respect to" integrating rule-based systems like Barnett with case-based systems like Allen. Appx246.

### C. The Prior Art Discloses Step #5's "Saving The State," And The Board Did Not Conclude Otherwise.

With Steps 1-4 concededly present in Barnett, and an admitted motivation to augment Barnett with Allen, the only question is whether the prior art, considered in combination, would suggest Step #5 to a person of ordinary skill in the art. It does and it did.

Recall that, on the Board's articulation of the claim language, Step #5 requires "when a likely solution [to a problem in the computer system] cannot be determined," "saving a state of the computer system." Appx7 (quoting Appx23, col. 6:3-4) (brackets and bracketed language added by the Board). Thus, the Board understood Step #5 to have three parts: the condition in which "a likely solution cannot be determined"; that the "likely solution" is "to a problem in the computer system"; and, when that is true, the system "sav[es] a state of the computer system."

We begin with "saving a state," because it is helpful to understanding the invention and the errors that the Board committed (which are discussed in § I.D., below). We do so only in the interest of completeness, however—the Board did not rule against EMC on this point, and so under settled principles of administrative law, this could not be a basis to affirm. *In re Applied Materials, Inc.*, 692 F.3d 1289,

1294 (Fed. Cir. 2012) ("[t]he Board's judgment must be reviewed on the grounds upon which the Board actually relied" (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), and *In re Lee*, 277 F.3d 1338, 1345-46 (Fed. Cir. 2002))). That is, because the Board did not find "saving a state" absent from the prior art, this Court cannot do so for the first time on review. *See Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1365 (Fed. Cir. 2015) (the Court "must not ourselves make factual and discretionary determinations that are for the agency to make").

It was with good reason that the Board did not find "saving the state" to be missing from the prior art. Step #5 teaches that if the AI system does not have a likely solution to the problem, the system "saves" the state of the computer, i.e., it stores information about the problem, Appx23, col. 6:3-4, just like Sally the Sixth Grader does when she cannot solve a math problem, *supra* 1. Although not claimed, the purpose of storing the information—as with Sally—is to allow a human expert to examine the problem and try to find a solution. Appx22-23, cols. 4:66-5:6.

As Dr. Sacerdoti explained, saving the state of the computer system "at the point when a failure occurs" is a "natural and obvious" improvement to an AI system. Appx569, 570 (Sacerdoti Decl.). This technique is "an effective means of enabling the debugging and improvement of *virtually any software program*," Appx569 (emphasis added), and it "is at least as important for rule-based systems [e.g., Barnett] as it is for conventional ones," Appx2342-43 (Sacerdoti Reply Decl.). Thus, Dr. Sacerdoti concluded, "[i]f an embodiment of the Barnett patent were not to have such a capability, it would be obvious to a skilled artisan to include this capability when implementing the invention disclosed in Barnett." Appx569.

In fact, Allen describes in detail how to save problems that its artificial intelligence system cannot solve. *See* Appx501 (Fig. 2); Appx513, cols. 3:58-4:27. First, the system receives a problem to be solved. Appx513, col. 3:59-61. The problem is translated (or "indexed," *see* above at 7) into a format the AI system can understand. Allen indexes a problem using a "case template." The case template includes the key features of the problem (which are known as "attribute-value

pairs").[9] The cases stored in Allen's knowledge database also contain attribute-value pairs. Appx513, cols. 3:66-4:3. To find a solution to the current problem, the AI system compares the attribute-value pairs describing the current problem to the attribute-value pairs describing the stored cases.[10] The system seeks a "best case," the case that most closely matches the current problem. *Id.* col. 4:4-7. When it finds the best case, the system decides whether to perform the solution associated with that case. *Id.* col. 4:11-16, 4:24-27.

Sometimes, however, the AI system cannot find an acceptable solution associated with the best case. When that happens, it "adds a new case" to the case base, *id.* col. 4:17-18, which will contain a description of the problem the AI system was unable to solve, Appx515, col. 8:19-30. The new case "partly or fully copies the case template"—that is, the attribute-value pairs describing the problem. *Id.*; Appx514,

---

[9] Appx514-15, cols. 5:4-6, 8:7-9 (entering the problem into a case template); Appx513, col. 4:46-51 (giving examples of attribute-value pairs); *see also* Appx2335-40 (Sacerdoti Reply Decl.) (describing Allen's case template).

[10] *See* Appx513, cols. 3:66-4:3; Appx513-14, cols. 4:28-5:65 (describing "feature-matching" techniques); Appx502-03 (Figs. 3A and 3B, showing problem 311 translated into problem template 312 for comparison with stored cases).

col. 5:3-6 (describing case template). When the new case is created, a human expert can provide a solution for the problem. Appx515, col. 8:19-30. This new case, containing a description of the problem and the expert solution, is then added to the AI system's knowledge databases. *Id.* col. 8:28-30.

The combination of Barnett and Allen would work the same way when addressing a computer problem. First, Barnett's sensors gather information about a computer problem. That information is entered into a "case template" containing information (saved as attribute-value pairs) about the problem. Appx2335 (Sacerdoti Reply Decl.). Then, Allen's inference engine searches for a solution to the problem. *Id.*; Appx513, cols. 3:66-4:3. If it finds a solution, it implements it. Appx513, col. 4:4-16. If not, it saves the case template (containing the information gathered by the sensors), and asks for help. Appx513-15, cols. 4:17-18, 8:19-30; Appx2338. Just as in Allen, "when a likely solution" could not be determined by the AI engine, the combination "saves the state of the computer system," as required by claim 6 of the '839 Patent. *See* Appx2335-36 (Sacerdoti Reply Decl.) (describing how

Allen's new case would contain information about the state of the computer system).

### D. The Board Erroneously Reviewed Barnett And Allen Separately Rather Than In Combination, And On That Basis Found No Teaching Of Step #5's "When A Likely Solution [To A Problem In The Computer System] Cannot Be Determined."

With regard to the rest of Step #5—the portions concerning "a problem in the computer system" and "when a likely solution cannot be found"—the Board looked at each reference in isolation. It concluded that neither Barnett nor Allen *by itself* teaches the entirety of Step #5 of the '839 Patent. The Board reasoned that Allen is not directed to computer systems (without acknowledging that Barnett is), Appx7-9, and that Barnett never fails to find a likely solution to a computer problem (without acknowledging that Allen does), Appx9-14.

This was error as a matter of law—as the Board itself made clear when it earlier chided Clouding for doing just the same thing. Appx207 (Institution of Inter Partes Review) (criticizing Clouding's response to EMC's petition as "based improperly on what Allen '664 teaches individually, and not on the teachings of the combined references"). The Board may not "attack" each reference individually "where the rejection

is based upon the teachings of a combination of references." *In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) (citing *In re Keller*, 642 F.2d at 425); *see also Duramed Pharm., Inc. v. Watson Labs.*, Inc., 413 F. App'x 289, 294-95 (Fed. Cir. 2011) ("the district court improperly analyzed and rejected the teaching of each [reference] in isolation"); U.S. Patent & Trademark Office, Manual of Patent Examination Procedure § 2145(IV) (9th ed. Rev. 7, Nov. 2015). A reference "must be read, not in isolation, but for what it fairly teaches in combination with the prior art as a whole." *In re Merck*, 800 F.2d at 1097.

That is because the obviousness inquiry, unlike anticipation, asks what the prior art teaches a person of ordinary skill, not whether the invention is disclosed within the "four corners" of a single reference. *See* 2-5 Donald S. Chisum, *Chisum on Patents* § 5.03[3][a][i] (2015). The inquiry into obviousness is "expansive and flexible," rather than "rigid," *KSR*, 550 U.S. at 415, which means (among other things) considering "the inferences and creative steps that a person of ordinary skill in the art would employ," *id.* at 418. A person of ordinary skill understands how to analyze "interrelated teachings of multiple patents" and put them "together like pieces of a puzzle." *Id.* at 418, 420; *see also*

*EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985) (court must consider each reference for "everything it *teaches* by way of technology and is not limited to the particular *invention* it is describing and attempting to protect"); *Belden*, 805 F.3d at 1076 (citing *EWP*; reversing finding of nonobviousness where Board "disregarded" teachings in the references).

Here, when the references are properly considered, Barnett's AI system for computer diagnosis, augmented by the improved system of Allen, teaches every limitation of claim 6.

#### 1. The Board Erred By Limiting Allen To Certain Embodiments, And Failing To Consider The Combination of Allen And Barnett.

The Board began its analysis of claim 6 by focusing on Allen alone. Appx7-9. It asked whether Allen teaches "when a likely solution [to a problem in the computer system] cannot be determined." Appx7 (brackets in original). That bracketed language added by the Board—"to a problem in the computer system"—reflects the Board's single-minded focus on whether Allen on its face is directed to problems in a computer:

> [Claim 6] requires, when a likely solution to a problem *in the computer system* cannot be determined, saving a state of the

> computer system. For example, claim 6 recites "[a] method of optimizing *a computer system*," "detecting *a problem in the computer system*," "activating an AI engine in response to *the problem*," "utilizing … sensors to gather information *about the computer system*," and "determining … a likely solution to *the problem*." All these limitations indicate that the detected "problem" is a problem *in the computer system* and the "likely solution" is to this problem.

*Id.* (all emphases in original).

The Board discounted Allen entirely because Allen does not refer explicitly to diagnosing computer problems. Appx7-8; *see, e.g.*, Appx8 ("Petitioner concedes that [Allen] 'does not specifically say anything about *solving a computer problem* in the terms of diagnosing a computer system or a computer error in the way that Barnett teaches.'"). This conclusion was erroneous for multiple reasons.

**a.** First and foremost, even if Allen's AI system was not sufficiently broad to be used in a computer system—and it is, *see infra* 46-49—the Board's analysis was erroneous for the simple reason that *Barnett* is focused explicitly and overwhelmingly on diagnosing problems in computer systems.

Barnett's invention is an AI system for a computer network (which it calls a "distributed system"). Appx493, cols. 1:50-58, 2:35-36, 2:51-54. Barnett mentions "computers" or "distributed systems" nearly 60 times.

Appx493-96. The very first paragraph of Barnett's "Detailed Description" mentions computers 10 times, and explains that Barnett's AI system monitors "host computers," "preferably workstations or personal computers." Appx493, col. 2:32-50. One of ordinary skill in the art would understand that the combination of Barnett and Allen would address problems in a computer system. Appx2238-39 (Sacerdoti Reply Decl.).

The Board's contrary conclusion picks apart the prior art in just the way that this Court and its predecessor have disapproved for nearly 40 years. In *Keller*, for instance, the C.C.P.A. considered the obviousness of claims to a pacemaker using a digital timer. 642 F.2d 413. The applicant did not dispute that the prior art disclosed all "features of the rejected claims other than the use of digital timing" in a pacemaker, but argued that there was no obviousness because the prior art that disclosed digital timers (Walsh) did so in the context of *studying* mammalian hearts, not in a *therapeutic* pacemaker. *Id.* at 424-25. The court rejected this argument because "one cannot show non-obviousness by attacking references individually where, as here, the rejections are based on combinations of references." *Id.* at 426. The

test was not "whether a suggestion to use digital timing in a cardiac pacer is found in Walsh," but what the prior art *together* "would have suggested to those of ordinary skill in the art." *Id.*; *see also In re Merck,* 800 F.2d at 1097 (reference "must be read, not in isolation, but for what it fairly teaches in combination with the prior art as a whole"). Similarly, the test here is not whether either Barnett or Allen *alone* teaches an AI engine for diagnosing computer problems that can save its place, but whether Allen and Barnett *together* would have suggested such a system to one of ordinary skill in the art.

By failing to undertake this analysis, the Board "fundamentally misconstrued" EMC's arguments that Barnett and Allen together rendered the claims obvious, and as a result, "failed to provide a full and reasoned" analysis. *Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1323, 1325 (Fed. Cir. 2015) (vacating and remanding where the Board "failed to straightforwardly and thoroughly assess the critical issue" raised by the patentee); *see also In re Lee*, 277 F.3d at 1344 (vacating and remanding where Board omitted discussion "of a relevant factor required by precedent"; citing *Motor Vehicle Mfrs. Ass'n v. State Farm*

*Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (an agency's "fail[ure] to consider an important aspect of the problem" is grounds for vacatur)).[11]

**b.** The Board's conclusion also was erroneous for the further reason that (as EMC demonstrated to the Board, *e.g.*, Appx276-77, 280, 303-04, 2337-38) Allen indeed can be applied to problems in a computer system.

Allen describes its system generically as operating in a "field of application."[12] The system will be *deployed* in some field or domain, *supra* 5, but nowhere does Allen *limit* its system to any field in particular. On the contrary, Allen's system is designed to improve AI systems in any "application field" or "field of operation." *See* Appx512, col. 1:30-41. Allen describes a variety of ways to record information about a problem, which are sufficiently generic to allow the system to

---

[11] *See also Nike, Inc. v. Adidas AG*, 812 F.3d 1326, 1339 (Fed. Cir. 2016) (remanding to the Board based on failure to consider arguments necessary to obviousness determination); *In re Sullivan*, 498 F.3d 1345, 1350-51 (Fed. Cir. 2007) (remanding to the Board based on failure to consider evidence necessary for obviousness determination).

[12] Appx512, col. 1:28-29; *see id.* col. 2:45-49 ("A case-based reasoning system 101 *for a particular application field* may comprise[] a rule base 102 of inferential rules 103 suited *to that field*, a case base 104 of exemplar cases 105 which are notable *in that field*, and a data base 106 of relevant problem data 107 *for that field*.") (emphases added).

record information in various contexts, including computer problems. *See* Appx513, col. 4:45-51 (listing "(a) a yes/no data type, i.e., a one-bit boolean value, (b) a numeric data type, (c) a text string data type, and (d) a multiple-choice" as possible ways to describe a problem).

Allen does give two *examples* of how its system may be used in particular fields—processing loan applications and answering questions at a help desk—but they are just that: examples.[13] Nowhere does Allen limit itself to those examples, and it would be legal error to limit a reference to its preferred embodiments: "A reference must be considered for everything that it teaches, not simply the described invention or a preferred embodiment." *In re Applied Materials*, 692 F.3d at 1298; *Belden*, 805 F.3d at 1076; *EWP Corp*, 755 F.2d at 907; *see also Merck & Co. v. Biocraft Labs., Inc.*, 874 F.2d 804, 807 (Fed. Cir. 1989) ("the fact that a specific [embodiment] is taught to be preferred is

[13] *See* Appx512, at col. 2:51-53 ("*For example*, in a case-based reasoning system 101 for loan approval …") (emphasis added); *see also* Appx513, col. 4:38-44 (in describing the "example" of a "case-based reasoning system … for loan approval," pointing to attributes of a generic case-based system, *see* Appx502, Fig. 3A); Appx515, col. 8:62-64 ("an example" of "one application field" "for providing user help on call-in complaints"); Appx516, col. 10:39-44 (describing "a preferred example" for call-in centers).

not controlling, since all disclosures of the prior art, including unpreferred embodiments, must be considered" (quoting *In re Lamberti*, 545 F.2d 747, 750 (C.C.P.A. 1976))). After all, one may not assume that "a person of ordinary skill attempting to solve a problem will be led only to those elements of prior art designed to solve the same problem."[14]

It would be especially senseless to limit Allen to these particular examples, given how little loan processing and call-in centers have in common with each other. *Compare* Appx502 (Fig. 3A, example for loan processing as described at Appx513, col. 4:38-44) *with* Appx506 (Fig. 6, example for call-in complaints as described at Appx515, col. 8:62-64); *cf.* *ScriptPro LLC v. Innovation Assoc., Inc.*, __ F.3d __, No. 2015-1565, 2016 WL 4269920 (Fed. Cir. Aug. 15, 2016) ("a specification's focus on one particular embodiment or purpose cannot limit the described

[14] *KSR*, 550 U.S. at 420; *see also id.* at 418 (it is error to "seek out precise teachings directed to the specific subject matter of the challenged claim"); *Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371, 1380 (Fed. Cir. 2005) (in an obviousness analysis, "[w]hat a reference teaches a person of ordinary skill is not … limited to what a reference specifically 'talks about' or what is specifically 'mentioned' or 'written' in the reference"); *In re Applied Materials*, 692 F.3d at 1298 (a reference must be considered "for everything that it teaches").

invention where that specification expressly contemplates other embodiments or purposes").

In fact, in testimony that was unrebutted and unchallenged, Dr. Sacerdoti explained that Allen's disclosure related to help desks would affirmatively suggest to one of ordinary skill that Allen could be used to solve computer problems. Appx570-71 ("It was known in the art that a significant use of 'help desk' applications was to provide assistance in maintaining a computer system") (citing Appx515-16, cols. 8:64-9:1). Concluding that Allen does not apply to problems in computers would be akin to treating it as non-analogous art—an argument that Clouding did not even make.

**c.** The Board's final written decision, however, never even assessed the merits of Allen's disclosure, and instead rested on a theory of waiver. The Board said that EMC relied exclusively on Allen for the element "when a likely solution cannot be determined," Appx7; that EMC then failed to argue the point, *see* Appx8; and then withdrew any reliance on Allen during oral argument, *see id.*

As an initial matter, it is simply incorrect that EMC relied on Allen alone. The Petition stated expressly that "[t]he combination of

Barnett and Allen '664 teaches this" element, and cited specific portions of each reference in support. Appx115-16. The same is true of Petitioners' Reply. *See, e.g.*, Appx266 ("The combination of *Barnett* and *Allen '664* discloses to persons of skill in the art a method whereby when a likely solution to a problem cannot be determined by an AI engine, a state of the computer system is saved."). EMC repeated its position yet again in the Response to Patent Owner's Observation. *E.g.*, Appx303 ("*Barnett* discloses collecting computer state information and a person of ordinary skill would find it obvious to save such information when a likely solution cannot be found in view of the teachings of *Allen '664.*"); *see also* Appx302 ("A skilled artisan applying this teaching [from Allen] to *Barnett*—which teaches collecting current information about the computer (i.e., state information) during diagnostics—would find it obvious to save the state of the computer system when a likely solution cannot be found.").

If what the Board meant is that EMC did not specifically argue that Allen fails to confront the condition where there is no likely solution "in the computer system," that is both misplaced and wrong. It is misplaced because Clouding never disputed that a combination of

Allen and Barnett would address faults in a computer system.[15] On the contrary, Clouding expressly acknowledged that there was a motivation to combine Allen with Barnett, Appx246-47, and Barnett obviously operates within a computer system, Appx493, col. 2:34-39; *supra* 43-44. It is hard to imagine what the combination of Barnett and Allen *would* apply to, if not to diagnosing computer problems.

In any event, EMC did discuss Allen in the very context of faults in computer systems. *See, e.g.*, Appx274 (Petitioners' Reply) ("*Allen '664* actually teaches saving a state of the computer system, when a computer system is being diagnosed as it is when *Allen '664* is combined with *Barnett*."); Appx278 ("When the teachings of *Allen '664* are applied to diagnosis of a faulty computer system, the 'facts about the problem' are a digital model of the state of the computer system that is displayed when the fault is diagnosed."); Appx116 (Petition) ("Barnett's diagnostic system, as modified by Allen '664, would invoke a rule to save a state of the computer system …").

---

[15] *See* Appx247-48 (Patent Owner Response) (disputing whether the combination would "save computer state," not whether the combination could be applied to computer problems); Appx158 (Patent Owner Preliminary Response) (same); Appx297 (Patent Owner Observations) (same).

Nor did EMC "withdraw" its reliance on the combination of Barnett and Allen "at oral argument." Appx8. At argument, the Board pressed EMC to explain whether Allen *expressly* discloses detecting a problem in a computer system. *E.g.*, Appx331, Tr. 13:12-14; *see also* Appx338-39, Tr. 20:7-21:4. EMC acknowledged—in the language that the Board quotes in part at Appx8—that Allen does not use the magic words "in a computer system." *See, e.g.*, Appx331, Tr. 13:15-17 (Allen "*itself* does not *describe* using the AI engine to detect or respond to a problem in the computer system itself") (emphasis added). For the reasons set forth above, however, that is legally irrelevant to the question of what a person of ordinary skill in the art would have understood the reference to teach, applying ordinary creativity, and especially in light of Barnett. *Supra* 40-42. This is why EMC went on to explain, over[16] and over[17] and over[18] and over,[19] that Allen is not

[16] Appx331, Tr. 13:4-9 (making clear that Allen is "not limited in … the types of problems you could apply it to"; reminding the Board that "nothing in Allen would limit it to" the examples disclosed in the specification).

[17] Appx331, Tr. 13:20-23 (reminding the Board that Allen was "broadly applicable to multiple types of problems").

limited to the embodiment concerning loan processing, and that the *combination* of Allen and Barnett renders the invention obvious.

So the argument was repeatedly made, but the Board would not hear it. When EMC tried to explain that "Allen does not specifically say anything about solving a computer problem … in the way that Barnett teaches," the Board cut off EMC's counsel, saying "[t]hat should just answer my question, and that's it." Appx339, Tr. 21:2-22. Yet even then, EMC went on to reiterate that it was relying on the combination,[20] and that "Allen is not limited" to any particular problem, Appx345, Tr. 27:16-24. There was no waiver.

#### 2. The Board Further Erred By Analyzing Whether Barnett, In Isolation, Teaches "When A Likely Solution Cannot Be Determined."

**a.** Having concluded that Allen by itself does not teach "a likely solution [to a problem in the computer system]," the Board asked whether Barnett—in isolation—teaches these aspects of Step #5.

---

[18] Appx331-32, Tr. 13:23-14:4 (reiterating that EMC was relying on the combination of Allen and Barnett to teach the challenged limitation).

[19] Appx355, Tr. 37:12-14 ("what we are relying on is the combination of Allen and Barnett").

[20] Appx344, Tr. 26:1-6 ("But the answer is we are relying on the combination of Barnett and Allen together").

Appx9-14. The Board concluded that Barnett fails for a different reason than Allen. The Board did not focus on the "computer problem" aspect of the claim, as it had for Allen, because Barnett plainly solves computer problems. *Supra* 43-44. Instead, the Board assessed whether Barnett ever contemplates a circumstance "when a likely solution cannot be determined." Appx9-14. The Board made no attempt to consider Barnett in combination with Allen; once the Board began discussing Barnett (at Appx9), it did not even mention Allen until the final sentence of the decision, Appx15.

This was error as a matter of law, for the same reason that it was error when the Board looked at Allen alone for other aspects of the combination. "Non-obviousness cannot be established by attacking references individually where the rejection is based upon the teachings of a combination of references." *In re Merck*, 800 F.2d at 1097; *supra* 40-42. Even if Barnett by itself did not disclose the circumstance when "a likely solution cannot be found," *Allen* surely does—so much so that Clouding did not dispute the issue. Appx243-44.

As described above (at 37-39), when Allen's AI system is presented with a new problem, it searches its knowledge database for the "best

case" matching the problem. Appx513, col. 4:4-7. When it finds the "best case," the system then considers whether the solution associated with that best case is appropriate. *Id.* col. 4:11-16, 4:24-27 (describing how Allen's AI system "attempts to determine" if the solution associated with the best case "is a correct action to perform"). When the solution is not appropriate, Allen's AI system has failed to find a likely solution. Appx513, 515 cols. 4:17-18, 8:19-30. It then saves the problem for review by a human expert, which allows Allen's system to "'learn' how to … do its job on a dynamic basis." Appx512, col. 2:15-16; *supra* 16. Allen therefore teaches this aspect of Step #5: "when a likely solution cannot be determined." Appx23, col. 6:3.

**b.** The Board further erred in finding that Barnett does not teach a circumstance in which "a likely solution cannot be determined." It erred legally in limiting Barnett to a single embodiment, as it had done with Allen; and it erred factually in finding that Barnett never fails to find a solution, in the face of Dr. Sacerdoti's unrebutted testimony on this point.

Recall that Barnett's AI system is programmed with rules for a particular computer system. *Supra* 14-15; *see* Appx495, col. 6:30-35, 45-

47. The rules must be updated when new components are added to the computer system. *Id.* col. 6:30-37; Appx11 (Final Written Decision) (when new components are added, "[t]he diagnostic system, however, would 'require new models and meta-models.'" (citing Appx495, col. 6:31-37)). Barnett is silent about what happens when new components are added to the computer network but new rules are not. *Id.*; Appx2331-32 (Sacerdoti Reply Decl.). On that precise issue, however, Dr. Sacerdoti explained—in unrebutted testimony—that when Barnett's system is faced with a new component and is not programmed with rules for treating that component, it will fail to find a solution, *see* Appx2333—that is, there will be a situation in which "a likely solution cannot be determined." *See* Appx2331-36 (Sacerdoti Reply Decl.).[21]

[21] The Board seems to have treated Dr. Sacerdoti's analysis as an admission that Barnett never fails to find a solution. Appx10. On the contrary, Dr. Sacerdoti was explaining that *when* Barnett's AI system fails to find a solution, the patent is silent about what to do. Appx2331-32. Dr. Sacerdoti was unequivocal that Barnett "explicitly contemplates embodiments in which the diagnostic system would initially fail to determine a likely solution to a fault." Appx2332. Barnett's silence on what to do when the system fails to find a solution is precisely why one of ordinary skill would turn to Allen—Allen teaches saving the problem and updating the AI system's knowledge database with an appropriate solution. *See* Appx512, col. 2:13-16.

The Board, however, concluded that Barnett purported to invent an infallible AI system, Appx12—and in reaching that conclusion, it again committed the cardinal sin of limiting a reference to one of its embodiments. Barnett does describe one embodiment in which the rules describe a "generic computer system." Appx495, col. 6:47-50. In that embodiment, those rules could be used to analyze any computer system made up of the same types of components as the "generic" system. *Id.* col. 6:50-56.

Barnett, however, did not limit its disclosure to that one ambitious embodiment. Just 15 lines above the "generic computer system" embodiment, Barnett describes a different embodiment in which a likely solution might not be found. In that embodiment, new rules are necessary whenever new components are introduced into the system. *Id.* col. 6:31-44; Appx2332-33 (Sacerdoti Reply Decl.); *supra* 14-15 (discussing same). Clouding even recognized this at oral argument, agreeing that "where new equipment has been added" to the computer system, "new rules *have to be add[ed]* to specify the new equipment." Appx372, Tr. 54:6-8 (emphasis added). Dr. Sacerdoti explained that this embodiment "explicitly contemplates" a situation "in which the

diagnostic system would initially fail to determine a likely solution to a fault." Appx2332 (Sacerdoti Reply Decl.).

The Board did not address this point; its analysis was based on the "generic computer system" embodiment. Appx11-12. That also was the reason that the Board erroneously rejected Dr. Sacerdoti's opinion. The Board said that "Dr. Sacerdoti's opinion is inconsistent with the above disclosure from Barnett," but the disclosure it pointed to was the "generic computer system" embodiment. *See* Appx12 (discussing Appx495 (Barnett), col. 6:47-56). Dr. Sacerdoti's analysis, however, was not so limited; he explained more broadly how one of ordinary skill would understand the entirety of Barnett's disclosure. *See* Appx2332-34 (Sacerdoti) (criticizing Clouding for discussing only the "generic computer system" embodiment, and going on to discuss other embodiments of Barnett).[22]

In contrast to Dr. Sacerdoti's expert analysis, Clouding offered only attorney argument that Barnett invented an extraordinary AI

[22] The Board's discussion (Appx12-14) of Barnett's disclosure that adding more rules to the rule base can give a more precise solution, *see* Appx495-96, cols. 6:66-7:6, is also not responsive to the embodiment Barnett discloses at Appx495, col. 6:31-44.

system that always will have the answer to every problem.[23] This argument was based on Clouding's contention that Barnett could find a solution "without requiring any modification of its rules," Appx246, which flies in the face of how AI systems work. Clouding presented no evidence that Barnett's system can make up its own rules without human intervention. Barnett itself teaches that rules must be "written," "constructed," "developed," and "added" to address changes in the computer network. *See* Appx493, col. 1:53-54; Appx495, col. 6:49-50, 6:43-44; Appx496, col. 7:2-3; *see also, e.g.,* Appx809, 837-38 (Riesbeck textbook) (describing programming a rule base). Without those rules, a system cannot determine a solution. Appx2333 (Sacerdoti).

* * *

Barnett and Allen together teach the only element at issue here, Step #5. In concluding otherwise, the Board erroneously treated the

[23] *E.g.*, Appx246 (Patent Owner Response) ("the system described by *Barnett* is purportedly capable of learning any necessary configuration information to analyze the performance of the computer system, and making recommendations on ways to improve the performance of that system without requiring any modification[] of its rules"); Appx370, Tr. 52:20-22 ("Barnett uses such an abstract metamodel that it doesn't even contemplate the idea of not having a rule for a situation"); Appx250 ("*Barnett* never even contemplates a situation where a solution to a problem cannot be found.").

references separately. The word "Allen" does not appear once in the Final Written Decision between the top of page 9 (where the Board begins to consider Barnett) and the top of page 15 (where the Board mentions it in a one-sentence summary of its conclusions). Indeed, the sum total of the Board's discussion of Barnett and Allen *in combination* is five sentences that merely repeat the basis for institution.[24]

By separately considering whether each reference teaches Step #5, on their own and in isolation, the Board conducted an unduly narrow analysis. When the references are considered together, as they must be, every limitation of claim 6 plainly is met. Even if the Board were right that Allen is never applied to a computer problem, and that Barnett's AI engine *always* finds an answer—and it is not—the decision of the Board would have to be vacated and remanded because the Board failed to consider what the "combined teachings of the references would have suggested to one of ordinary skill in the art." *In re Young*, 927 F.2d at 591.

---

[24] *See* Appx4-5 ("We instituted review of claims 6, 8, and 14 based on the assertion of unpatentability under 35 U.S.C. § 103 over Barnett and Allen '664."); Appx5 ("the instituted review…"); Appx7 ("Petitioner contends…"); *id.* ("Petitioner has not demonstrated…"); Appx15 ("Petitioner has not proven…").

## CONCLUSION

For the foregoing reasons, the Court should reverse the Board's decision and find claims 6, 8, and 14 of the '839 Patent invalid as obvious, or in the alternative, vacate and remand for further proceedings.

Respectfully submitted,

*/s/ Eric A. Shumsky*

Eric A. Shumsky
ORRICK, HERRINGTON &
SUTCLIFFE LLP
1152 15th Street NW
Washington, DC 20005
(202) 339-8400

Bas de Blank
Elizabeth R. Moulton
ORRICK, HERRINGTON &
SUTCLIFFE LLP
1000 Marsh Rd.
Menlo Park, CA 94025

Paul T. Dacier
Krishnendu Gupta
Thomas A. Brown
EMC CORP. &
EMC INTERNATIONAL U.S.
HOLDINGS, INC.
176 South Street
Hopkinton, MA 01748

*Counsel for Appellants*

September 6, 2016

# ADDENDUM

# TABLE OF CONTENTS

PTAB Decision, dated January 29, 2016 .................................... Appx1-16

U.S. Patent No. 5,944,839 ........................................................ Appx17-23

# PTAB Decision, Dated January 29, 2016

Trials@uspto.gov
Tel: 571-272-7822

Paper 34
Entered: January 29, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

EMC CORPORATION, EMC INTERNATIONAL US. HOLDINGS, INC., AND VMWARE, INC.,
Petitioner,

v.

CLOUDING CORP.
Patent Owner.

---

Case IPR2014-01309
Patent 5,944,839 A

---

Before JAMESON LEE, RAMA G. ELLURU, and
MIRIAM L. QUINN, *Administrative Patent Judges*.

ELLURU, *Administrative Patent Judge*.

# FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

# I. INTRODUCTION

EMC Corporation, EMC International U.S. Holdings, Inc., and VMware, Inc. (collectively "Petitioner") filed a Petition requesting an *inter partes* review of claims 1, 2, 6, 8, 14, 15, and 17 of U.S. Patent No. 5,944,839 A (Ex. 1001, "the '839 patent"). Paper 1 ("Pet."). Clouding Corp. ("Patent Owner") filed a Preliminary Response to the Petition. Paper 9. On February 4, 2014, we instituted an *inter partes* review of claims 6, 8, and 14. Paper 14 ("Dec."), 16. Patent Owner timely filed a Response to the Petition. Paper 22 ("PO Resp."). Petitioner subsequently timely filed a Reply to Patent Owner's Response. Paper 25 ("Pet. Reply").

An oral hearing for this proceeding was held on October 20, 2015, a transcript of which has been entered in the record. Paper 33 ("Tr.")

We have jurisdiction under 35 U.S.C. § 6(c). This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

For the reasons that follow, we determine that Petitioner has not shown by a preponderance of the evidence that claims 6, 8, and 14 of the '839 patent are unpatentable.

## *A. Related Proceedings*

The '839 patent was the subject of IPR2013-00095 and IPR2013-00304, both of which have been terminated due to settlement. IPR2013-00095, Paper 18 (post-institution termination of *inter partes* review of claims 6, 8, and 14); IPR2013-00304, Paper 10 (pre-institution termination).

The parties identify several district court cases in which the

’839 patent was asserted. Pet. 3; Papers 7 and 8.

### *B. The ’839 Patent (Ex. 1001)*

The ’839 patent is directed to a system and method for automatic maintenance of a computer system. Ex. 1001, Abstract. According to the specification, there is a need for a computer utility that can learn from the results of prior diagnoses and solutions and apply that learned knowledge to solve future computer system problems. *Id*. at 1:47–50. The disclosure of the ’839 patent is directed to a “maintenance tool” that uses a set of sensors in combination with a case database to diagnose and solve computer problems automatically. *Id*. at 1:56–58. When one of the sensors detects a computer problem, it activates an artificial intelligence (“AI”) engine. *Id*. at 1:62-64.

The AI engine includes a database, which includes information to diagnose and correct problems with the computer system, and the sensors provide inputs to the database. *Id*. at 1:65. The AI engine diagnoses the cause of the problem and determines a solution, and if the AI engine needs more information, it may request additional data from one or more sensors. *Id*. at 2:4–8. If the maintenance tool has gathered all possible data and still does not include a solution to the computer problem, then the AI engine has failed to find a solution in the knowledge database, and the failure represents a computer problem that is new to the tool. *Id*. at 4:66–5:3. Accordingly, if the maintenance tool does not find a solution in the knowledge database, the tool preferably saves the state of the computer system and knowledge database to a location where the state and the database can be examined by a human computer expert. *Id*. at 2–8.

As recited in claim 6, the invention includes the requirement that when a likely solution cannot be determined, saving a state of the computer system.

### *C. Illustrative Claims*

We instituted a review of claims 6, 8, and 14. Claim 6 is independent and reproduced below, with the limitation at issue italicized. Each of claims 8 and 14 depends from claim 6.

> 6. A method of optimizing a computer system, the method comprising the steps of:
>
> > detecting a problem in the computer system;
> >
> > activating an AI engine in response to the problem detection;
> >
> > utilizing, by the AI engine, selected ones of a plurality of sensors to gather information about the computer system;
> >
> > determining, by the AI engine, a likely solution to the problem from the gathered information; and
> >
> > *when a likely solution cannot be determined, saving a state of the computer system.*

### *D. Ground of Unpatentability Instituted for Trial*

We instituted trial based on the following asserted references.

| **Reference** | **Patents** | **Date** | **Exhibit** |
|---|---|---|---|
| Barnett | U.S. Patent 5,664,093 | Sep. 2, 1997 | Ex. 1005 |
| Allen ’664 | U.S. Patent 5,581,664 | Dec. 3, 1996 | Ex. 1006 |

Petitioner provides declarations by Earl Sacerdoti, Ph.D. in support of its Petition. Exs. 1007, 1024. We instituted review of claims 6, 8, and

14 based on the assertion of unpatentability under 35 U.S.C. § 103 over Barnett and Allen ’664. Dec. 17.

## II. ANALYSIS

### *A. Claim Construction*

In an *inter partes* review, the Board interprets claim terms in an unexpired patent according to the broadest reasonable construction in light of the specification of the patent in which they appear. *See In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1278–79 (Fed. Cir. 2015); 37 C.F.R. § 42.100(b). Even under this standard, absent any special definitions, we give claim terms their ordinary and customary meaning, as would be understood by one of ordinary skill in the art at the time of the invention. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Any special definitions for claim terms must be set forth with reasonable clarity, deliberateness, and precision. *See In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

For purposes of this Decision, we do not need to expressly construe any claim term.

### *B. Prior Art References*

As noted above, the instituted review of claims 6, 8, and 14 was under 35 U.S.C. § 103 as having been obvious over the combination of Barnett and Allen ’664. Dec. 17.

#### *1. Barnett*

Barnett discloses a fault management system that includes a configuration manager that maintains configuration information of components used in the distributed system. Ex. 1005, Abstract. The fault management system also includes a plurality of measuring

agents, which obtain performance information from the system being monitored, and a diagnostic system having a plurality of rules stored therein. Ex. 1005, 1:59–67. The diagnostic system receives performance information from the measuring agents, and uses the stored rules to identify faults and provide solutions for the faults. *Id*. at Abstract, 2:4–9. Barnett's diagnostic system includes a rule based AI engine having a rules database. *Id*. at Fig. 2. According to Barnett, a primary objective of the invention is to provide a management system that understands abstract relationships between components (i.e., processes) and has rules written according to these abstract relationships. *Id*. at 1:50–54. Another objective of the invention is to provide a management system that understands the meta-model and model of the distributed system and has rules based on the meta-model relationship. *Id*. at 1:55–58.

*2. Allen '664*

Allen '664 describes a case-based-reasoning system for an application field that includes a rule base of inferential rules suited to that field and a case base of exemplar cases, which are notable in that field, and a database of relevant problem data for that field. Ex. 1006 at 2:45–49. For example, in a case-based-reasoning system for loan approval, the rule base may include rules about the creditworthiness of the customer, the case base may comprise exemplar cases that are known to match common fact scenarios, and the database may comprise relevant problem data such as loan payment histories, results of loan-officer interviews and credit-check data. *Id*. at 2:51–59.

*D. Claim 6*

Petitioner contends that claim 6 is unpatentable under 35 U.S.C. § 103 as obvious over the combination of Barnett and Allen ’664. Pet. 53–59. As noted above, claim 6 is independent. The claim limitation at issue is “when a likely solution cannot be determined, saving a state of the computer system.” Read in the context of the whole claim, this claim requires, when a likely solution to a problem *in the computer system* cannot be determined, saving a state of the computer system. For example, claim 6 recites “[a] method of optimizing *a computer system*,” “detecting *a problem in the computer system*,” “activating an AI engine in response to *the problem*,” “utilizing . . . sensors to gather information *about the computer system*,” and “determining . . . a likely solution to *the problem*.” All these limitations indicate that the detected “problem” is a problem *in the computer system* and the “likely solution” is to this problem.

Petitioner has not demonstrated by a preponderance of the evidence that the combination of Barnett and Allen ’664 teaches or suggests the condition “when a likely solution [to a problem in the computer system] cannot be determined,” as recited in claim 6. In its claim chart for claim 6, Petitioner refers to Allen ’664 for the entire limitation “when a likely solution cannot be determined, saving a state of the computer system.” Pet. 56–57 (Ex. 1006, 8:21–36).

Petitioner, however, does not provide argument that Allen ’664 teaches or suggests the condition “when a likely solution to a problem [in the computer system] cannot be determined.” In response to Patent Owner’s argument that Barnett does not “teach or suggest any outcome when the system cannot determine a likely solution to a

fault" and that this is "a situation that is not truly contemplated by Barnett" (PO Resp. 6–7), Petitioner does not contend that it instead relies on Allen '664 as teaching or suggesting the condition "when a likely solution to a problem [in the computer system] cannot be determined." *See* Pet. Reply 5–6. In any event, to the extent Petitioner relied, in its Petition, on Allen '664 as teaching this condition, that reliance was withdrawn at oral argument. At the hearing, Petitioner acknowledged that Allen '664 "does not describe using the AI engine to detect or respond to a problem *in the computer system* itself." Tr. at 13:15–17 (emphasis added). Rather, Petitioner states that Allen '664 describes "coming up with insurances rates or insurance quotes" and "whether you should offer a loan." *Id*. at 13:19–20, 25:11–13. Petitioner concedes that Allen '664 "does not specifically say anything about *solving a computer problem* in the terms of diagnosing a computer system or a computer error in the way that Barnett teaches." *Id*. at 21:15–18, 26:3–6 ("Barnett is specifically directed to the exact, same kind of problem, a fault in the computer system that the '839 patent is directed to."). Petitioner further responded to our questioning as follows:

> JUDGE LEE: I see. So the problem aspect doesn't come from Allen, then. It comes from Barnett.
> MR. DE BLANK: Yes, Barnett clearly describes, would clearly describe the problem.

*Id*. at 27:16–20; *see also id*. at 38:19–22 (stating that in the context of Allen itself, Allen is silent as to whether "its template has *anything to do with the computer system*") (emphasis added); *id*. at 27:9–11 (stating that what Allen '664 "adds to [the asserted combination] is using a case base in conjunction with the rules-based system Barnett

describes"); 72:21–25. Thus, we discern no argument by Petitioner that Allen '664 teaches or suggests "when a likely solution to a problem [in the computer system] cannot be determined."

The Petition also refers to Barnett as teaching "when a likely solution cannot be determined, saving a state of the computer system." Pet. 56 (citing Ex. 1005, 2:4–9). The portion of Barnett cited in the Petition describes the situation when a solution to a problem is determined, however, not "when a likely solution cannot be determined." At the cited disclosure, Barnett states "[t]he diagnostic system [AI engine] receives the configuration information from the configuration manager and the performance information from the plurality of measurement agents and uses the configuration and performance information with the plurality of rules to identify faults *and provide solutions for the faults*." Ex. 1005, 2:4–9 (emphasis added).

In its Response to the Petition, Patent Owner argues that Barnett does not contemplate the condition—"when the system cannot determine a likely solution to a fault." PO Resp. 6–7; *see also id.* at 11 ("*Barnett* never even contemplates a situation where a solution to a problem cannot be found."). Patent Owner asserts that Barnett is "capable of learning any necessary configuration information to analyze the performance of the subject computer system, and making recommendations on ways to improve the performance of that system without requiring any modification of its rules." *Id*. at 7 (citing Ex. 1005, 6:50–56).

Petitioner acknowledges that Barnett does not *expressly* refer to the condition when a solution to a problem cannot be determined—"I

don't believe there's anything specific in Barnett that says a solution can't be -- can't be found. It's silent on that point." Tr. 19:16–19; Ex. 1024 (Petitioner's expert stating "Patent Owner is correct in stating Barnett does not disclose any outcome when the system cannot determine a likely solution to a fault"). Petitioner, however, argues that "a person of ordinary skill in the art, as Dr. Sacerdoti recognized, would understand that there are instances where Barnett can't find a solution." Tr. 19:19–22. Petitioner specifically relies on the following disclosure from Barnett:

> Since the model of the distributed system is maintained by the configuration manager, and because the rules in the diagnostic system apply to classes of components, it is possible to introduce new component types, which require new models and meta-models. This includes new computer architectures (e.g. multiprocessor systems) as well as new software architectures.

Pet Reply 6 (citing Ex. 1005, 6:31–37). Based on this disclosure, Petitioner asserts that "*Barnett* explicitly contemplates an embodiment in which the diagnostic system would initially fail to determine a likely solution to a fault, but in which its configuration manager nonetheless remains capable of introducing 'new component types, which require new models and meta-models.'" Pet. Reply 6 (citing Ex. 1005, 6:31–37) (emphasis added). Referring to its witness, Petitioner further argues, "absent the encoding of models and meta-models describing the new component types, the diagnostic system would be *unable to derive a precise diagnosis*." *Id*. (citing Ex. 1024 ¶ 18) (emphasis added).

We are not persuaded that Petitioner's evidence, Dr. Sacerdoti's opinion testimony, supports sufficiently its contention that Barnett

teaches or suggests the condition "when a likely solution to a problem [in the computer system] cannot be determined." Barnett explains that because in its fault management system, the model of the distributed system being diagnosed is maintained by the configuration manager, and the rules in the diagnostic system apply to classes of components, it is possible to introduce new component types (e.g., computer and software architecture) into the system. Ex. 1005, 6:31–37. The diagnostic system, however, would "require new models and meta-models." *Id*. Barnett is silent as to what happens when new models and meta-models are not provided to the configuration manager when new component types are introduced into the system being diagnosed. *Id*. Indeed, Petitioner has not persuaded us that Barnett contemplates its configuration manager not having a new model and meta-model describing the newly added component. Yet, relying on the cited disclosure in Barnett, Dr. Sacerdoti opines that "[o]ne of ordinary skill in the art would understand this citation to mean that, absent the encoding of models and meta-models describing the new component types, the diagnostic system would be *unable to derive a precise diagnosis*." Ex. 1024, ¶ 18 (citing Ex. 1005, 6:31–37) (emphasis added); *see also id*. ¶ 19 (citing Ex. 1005, 6:66–7:6). Dr. Sacerdoti's opinion is unpersuasive because it is unsupported by adequate factual basis and explanation.

In particular, Dr. Sacerdoti does not provide sufficient factual basis in support of his opinion that Barnett contemplates the situation in which there is an absence of models and meta-models describing the new component types. To the contrary, as Patent Owner argues (PO Resp. 6–7, n.19), Barnett teaches that "[t]he configuration of any

computer can be learned because the information is *known to the computer*." Ex. 1005, 6:50–52 (emphasis added). Barnett explains that "[a] model can be constructed that describes a generic computer system" and "[r]ules can be constructed that analyze the performance of a generic computer." *Id*. at 6:47–50. Therefore, Barnett's "fault management system can be used to analyze the performance of *any computer system*, and make recommendations on ways to improve the performance of the system, without requiring any modification of the rules." Ex. 1005, 6:52–56 (emphasis added). We find that Dr. Sacerdoti's opinion is inconsistent with the above disclosure from Barnett. In sum, Petitioner has not sufficiently persuaded us regarding if and how Barnett's system operates in the absence of a model and metal-model describing newly added components. Because Petitioner has not persuaded us that Barnett contemplates a situation in which the configuration manager does not have a model and meta-model describing newly added components, we are not persuaded sufficiently by Dr. Sacerdoti's opinion, which is based on that premise. *See* Ex. 1024, ¶ 18.

Petitioner also relies on the following disclosure from Barnett:

> For example. the fault and performance analysis can be customized to particular applications and provide precise isolation of the faulty component by adding additional relationships in the abstract, or meta-model, and by adding additional rules related to these new classes of components. Therefore, this invention can identify performance problems to a coarse level with little effort, and to a fine level with additional customization.

Pet. Reply 6–7 (Ex. 1005, 6:66–7:6). Referring to its witness, Petitioner asserts that "[a]bsent the coding of additional relationships

in the meta-model and additional rules in its rule base describing the new classes of components, the diagnostic system would be *unable to derive a precise diagnosis*." *Id*. at 7 (citing Ex. 1024, ¶ 19) (emphasis added).

Dr. Sacerdoti also opines that "absent the coding of additional relationships in the meta-model and additional rules in its rule base describing the new classes of components, the diagnostic system would be unable to derive a precise diagnosis." Ex. 1024, ¶ 19 (citing Ex. 1005, 6:66–7:6). As a preliminary matter, Dr. Sacerdoti bases this opinion on a disclosure describing the identification of a fault (i.e., a "problem"), not a solution to the problem. Specifically, at the cited disclosure, Barnett states that "the fault and performance analysis can be customized to particular applications and provide precise *isolation of the faulty component* by adding additional relationships in the abstract, or meta-model, and by adding additional rules related to these new classes of components." Ex. 1005, 6:66–7:3. "Therefore, [the Barnett] invention can *identify performance problems* to a coarse level with little effort, and to a fine level with additional customization." *Id*. at 7:4–6 (emphasis added). Moreover, similar to our analysis above, because Petitioner has not persuaded us that Barnett contemplates a situation in which the configuration manager does not have coding of additional relationships in the meta-model and additional rules in its rules base describing the new classes of components, we are not persuaded sufficiently by Dr. Sacerdoti's opinion, which is based on that premise. *See* Ex. 1024, ¶ 19.

In any event, even accepting Dr. Sacerdoti's opinion that "absent the encoding of models and meta-models describing the new

component types" (Ex. 1024, ¶ 18) or "absent the coding of additional relationships in the meta-model and additional rules in its rules base describing the new classes of components" (Ex. 1024, ¶ 19), "the diagnostic system would be unable to derive a *precise diagnosis*," we are not persuaded by Petitioner's argument. Indeed, Petitioner contends that there is a diagnosis in the absence of encoding new models and meta-models describing the new component types, albeit not a *precise* diagnosis. Pet. Reply 6–7. Claim 6's recited condition is not "when a *precise* solution cannot be determined." Rather, the claim recites the condition "when a *likely* solution cannot be determined." Even if imprecise, Petitioner has not persuaded us that Barnett's diagnosis system cannot determine a "likely solution," when new components types are introduced into the diagnosed system, but a new model and metal-models describing the new components are not provided to the configuration manager. For example, Barnett explains that "if a service cannot be performed, then the diagnostic system will find *any* malfunctioning component." Ex. 1005, 4:15–16 (emphasis added). Petitioner has not persuaded us sufficiently that the resulting solution is not a "likely solution," even though it may not be a "precise" solution. In sum, the lack of a "precise" solution does not persuade us of a lack of a "likely" solution. Therefore, even accepting Dr. Sacerdoti's testimony, we are not persuaded that Barnett teaches the condition "when a likely solution to a problem [in the computer system] cannot be determined." In short, Petitioner has not proven by a preponderance of the evidence that Barnett's diagnostic system fails to provide a likely solution for a detected problem in a computer system.

Accordingly, Petitioner has not proven by a preponderance of the evidence that the combination of Allen ’664 and Barnett teaches or suggests “when a likely solution cannot be determined,” as recited in claim 6.

### *E. Claims 8 and 14*

Each of claims 8 and 14 depends from claim 6. Petitioner’s argument and evidence with respect to claims 8 and 14 rely on its analysis of independent claim 6 and do not cure the deficiencies discussed above. Pet. 57–59.

## III. CONCLUSION

For the foregoing reasons, we conclude that Petitioner has not shown by a preponderance of the evidence that any of claims 6, 8, and 14 of the ’839 patent is unpatentable.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 6, 8, and 14 have not been shown to be unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

Donald Daybell
Bas de Blank Monte M. F. Cooper
Jason Yu
ORRICK, HERRINGTON, &
SUTCLIFFE LLP
d2dptabdocket@orrick.com
m2sptabdocket@orrick.com
m26ptabdocket@orrick.com
j2yptabdocket@orrick.com

PATENT OWNER:

Tarek Fahmi
Megan M. Gallant
ASCENDA LAW GROUP, PC
tarek.fahmi@ascendalaw.com
megan.gallant@ascendalaw.com

# U.S. Patent No. 5,944,839

US005944839A

# United States Patent [19]

**Isenberg**

[11] **Patent Number: 5,944,839**

[45] **Date of Patent: Aug. 31, 1999**

[54] **SYSTEM AND METHOD FOR AUTOMATICALLY MAINTAINING A COMPUTER SYSTEM**

[75] Inventor: **Henri J. Isenberg**, Los Angeles, Calif.

[73] Assignee: **Symantec Corporation**, Cupertino, Calif.

[21] Appl. No.: **08/820,573**

[22] Filed: **Mar. 19, 1997**

[51] **Int. Cl.**[6] ...................................................... **G06F 11/00**

[52] **U.S. Cl.** ................................ **714/26**; 714/38; 714/47; 706/47

[58] **Field of Search** ................................ 706/45, 54, 47, 706/46; 395/183.02, 183.14, 183.15, 184.01, 185.01; 364/274, 274.1–274.7; 714/26, 38, 39, 47, 48

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,796,206 | 1/1989 | Boscove et al. | 364/555.01 |
| 5,455,947 | 10/1995 | Suzuki et al. | 395/650 |
| 5,481,481 | 1/1996 | Frey et al. | 364/551.01 |
| 5,619,656 | 4/1997 | Graf | 395/200.11 |
| 5,809,493 | 9/1998 | Ahamed et al. | 206/52 |

OTHER PUBLICATIONS

Se Young Park et al.; "OASIX: A Real–Time Knowledge–Based System for UNIX Operations and Administration"; 1991; pp. 389–392.

Jun Takamura; "An Expert System For Computer Operation And User Assistance"; Aug. 1989; pp. 87–95.

R. L. Ennis et al.; A Continuous Real–Time Expert System For Computer Operations; Jan. 1986; pp. 14–28.

*Primary Examiner*—Dieu-Minh T. Le

*Attorney, Agent, or Firm*—Fenwick & West LLP

[57] **ABSTRACT**

A system and method for the automated maintenance of a computer system. A scheduler periodically activates sensors. When activated, the sensors gather information about various aspects of the computer system. The sensors store this information in a knowledge database. The knowledge database also contains cases, questions, and actions. The cases describe potential computer problems and solutions. The questions are used to diagnose the problems while the actions describe steps that can be taken to solve the diagnosed problems. If the information gathered by the sensors indicates a problem with the computer system, then the sensors activate an artificial intelligence engine. The engine uses the information in the knowledge database to evaluate certain cases. If information necessary to evaluate a case is not in the knowledge database, then the engine activates a sensor to gather the information. As the cases are evaluated, the confidence levels of certain other cases, questions, and actions increase. If the confidence level of a case or question rises above a predetermined threshold, then the engine evaluates that case or question. If the confidence level of an action rises above the threshold, then that action represents the likely solution to the problem. Accordingly, the engine activates a sensor to perform the action. If no case, question, or action rises above the threshold, then the knowledge database does not contain enough information to solve the problem. In such a case, the engine saves the state of the computer system and knowledge database. Then, a human expert can update the database with the knowledge necessary to solve the problem.

**17 Claims, 3 Drawing Sheets**




SCHEDULER
110
112A
112B
112C
112D
KNOWLEDGE
DB
114
AI ENGINE
116
100

*FIGURE 1*



MONITOR 210
212
PROBLEM DETECTED?
NO
YES
RUN PROBLEM THROUGH KNOWLEDGE DB
214
LIKELY SOLUTION FOUND?
YES
PERFORM SOLUTION 218
NO
216
222
CAN TOOL ANSWER NEXT MOST LIKELY QUESTION 220
NO
MORE DATA TO GATHER?
NO
ADD NEW PROBLEM TO KNOWLEDGE DB 226
YES
YES
224
ANSWER QUESTION & FEED ANSWER BACK TO KNOWLEDGE DB 228
GATHER DATA


*FIGURE 2*


TO NETWORK
300
NETWORK CONNECTION 316
MOUSE 322
KEYBOARD 320
CPU 310
DISPLAY SCREEN 318
STORAGE DEVICE 314
RAM 312

FIGURE 3

# SYSTEM AND METHOD FOR AUTOMATICALLY MAINTAINING A COMPUTER SYSTEM

## FIELD OF THE INVENTION

This invention pertains in general to computer maintenance tools and in particular to a maintenance tool that automatically repairs a computer system with little or no human intervention.

## BACKGROUND OF THE INVENTION

Many strides have been made in the last few years to simplify the operation of personal computers. Even today, however, most personal computers contain complicated software that is not understood by the typical computer user. As a result, this software is often not optimized to fully realize the power of the computer system. If the unoptimized software is the operating system or other software critical to the computer system, the user may suffer significant computer delays or malfunctions.

Therefore, there is a great need for technical support professionals who can diagnose, repair, and optimize personal computers. However, these professionals are often unavailable or to expensive to call when a computer problem occurs. Therefore, various companies have developed software utilities that automate computer system maintenance.

Such utilities, however, rarely perform as well as a support professional. Some utilities, such as SYSTEM AGENT by Microsoft Corp. (Redmond, Wash.), merely schedule a fixed set of tools to execute at predetermined intervals. This “canned” approach is limited in its flexibility and ability to judge when to appropriately administer maintenance. Since maintenance can often take several hours, moreover, a fixed schedule often performs far too much maintenance.

Other utilities, such as NORTON’S SYSTEM DOCTOR by Symantec Corp. (Cupertino, Calif.) attempt to sense when computer maintenance is required. While this sensing removes the necessity of a fixed schedule, it often misdiagnoses the computer problem. As a result, the utility often applies an inappropriate solution.

There is a further need in the art for a computer utility that has a flexible approach toward diagnosing and solving computer system problems.

There is a further need in the art for a computer utility that can learn from the results of prior diagnoses and solutions and apply that learned knowledge to future computer system problems.

There is a further need in the art for a computer utility that judges when it is appropriate to administer a selected course of maintenance.

## SUMMARY OF THE INVENTION

The above and other needs are met by a computer utility that uses a set of sensors in combination with case base to diagnose and solve computer system problems. The sensors are actually diagnostic and repair tools executing on the computer system. The sensors act as a monitoring system that monitors the operation of the computer system. When one of the sensors detects a problem, the sensor activates an artificial intelligence (“AI”) engine.

The AI engine includes a large database, or case base, of knowledge held by computer experts. This knowledge includes that necessary to diagnose and correct problems



with the general operation of the computer system, including the operating system and hardware. In addition, the sensors act as inputs into the database.

The AI engine uses the sensor inputs to diagnose the likely cause of the problem and determine the best solution. While processing the problem, the AI engine may reach a point where additional data are needed. If so, the AI engine requests the data from the appropriate sensor or sensors. Once the appropriate solution is determined from the data, the AI engine activates the appropriate sensor to perform the repair.

A technical advantage of the present invention is that human intervention is not needed to diagnose and repair computer system problems.

Another technical advantage of the present invention is the reduced business cost associated within owning a personal computer. Since human intervention is rarely required, the cost of hiring a computer expert is avoided.

Another technical advantage of the present invention is that the present invention is easily upgradeable. The present invention can be programmed with new rules and sensors so that the invention can address an increasing number of computer problems.

Further features and advantages of the invention will become more readily apparent from the following detailed description when taken in conjunction with the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a high-level block diagram illustrating the major components of the present invention;

FIG. **2** is a flow chart illustrating the process by which the present invention detects, diagnosis, and rectifies computer problems; and

FIG. **3** is a high level block diagram of a computer system adapted to execute the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. **3** illustrates a high level block diagram of a computer system **300** adapted to execute the present invention. Preferably, the computer system **300** is a conventional personal computer or workstation having conventional hardware components such as processor **310**, a memory **312**, a storage device **314**, a network connection **316**, a display **318**, a keyboard **320**, and an input device **322**, such as a mouse. The processor **310** may be a conventional processor that is commercially available such as a PENTIUM™ processor by Intel Corporation (Santa Clara, Calif.), a POWERPC™ processor by IBM Corporation (Armonk, N.Y.) or Motorola, Inc. (Schaumburg, Ill.), an ALPHA™ processor by Digital Equipment Corporation (Maynard, Mass.), or a SPARC™ processor by Sun Microsystems, Inc. (Mountain View, Calif.). The computer system **300** can use conventional software operating environments that are commercially available such as MICROSOFT WINDOWS™ from Microsoft Corporation (Redmond, Wash.), Apple System 7.x from Apple Computer, Inc. (Cupertino, Calif.), or UNIX-based operating systems. A preferred embodiment of the present invention executes on a computer system **300** having an Intel compatible processor **310** executing the MICROSOFT WINDOWS operating system. The present invention is typically stored on the storage device **314** and executed by the processor **310** from memory **312** as is well understood in the art.

In the following discussion, the term "computer problem" refers to any aspect of the computer system **300** that is either malfunctioning or not optimized. Therefore, computer problems include such things as a fragmented file on storage device **314**, an incorrect video driver, and a poorly configured memory manager.

FIG. **1** is a high-level block diagram of the major components of a maintenance tool **100** according to the present invention. FIG. **1** illustrates a scheduler **110**, a number of sensors **112***a*–**112***d*, a knowledge database **114**, also called a "case base," and an artificial intelligence ("AI") engine **116**. The scheduler **110** is a software program that monitors the computer system **300** for problems. The scheduler **110** performs this monitoring by scheduling one or more of the sensors **112** to execute at predetermined times.

The sensors **112** are software programs that gather information from the computer system **300**. There are two main types of sensors **112**: event sensors and query sensors. Event sensors are those that sense data in response to an event. For example, a free storage space sensor could sense every time the free space on the storage device **314** shrinks below 10 megabytes. Query sensors, in contrast, are those that sense data in response to a query from an external source. For example, a free storage space sensor could sense and then provide the amount of available storage space in response to a request from another program. A sensor **112** can sense its data from the computer system **300**, or, if necessary, the sensor can prompt the user to input the required data. The present invention preferably contains many different event and query sensors. Each sensor **112** is responsible for sensing a different aspect of the computer system. In addition, each sensor **112** can perform certain repair operations related to the type of data it senses. For example, a free storage space sensor can also delete files in order to create more free space.

When a sensor **112** is executed by the scheduler **110**, the sensor **112** senses information about the computer system **300**. This information is then stored in the knowledge database **114** where it can be accessed by the AI engine **116**. In one embodiment of the present invention, the knowledge database is in the CBR Express case base format. Additional information about the CBR Express case base format is found in the CBR EXPRESS 2.0 FOR WINDOWS manual, available from Inference Corporation (El Segundo, Calif.) and which is hereby incorporated by reference. Of course, the present invention can use any knowledge database format that supports the functions described below.

The knowledge database **114** contains "cases" describing computer problems and solutions. A case is evaluated by answering a series of questions within the case. These questions are sequenced such that answering the questions diagnoses the computer problem and leads to a likely solution.

Questions belong to one of four categories: Yes/No; Numeric; Text; and List. Yes/No questions are those that have Yes or No answers. Numeric questions are those having answers that are integers. Text questions have textual answers. Finally, List questions have answers selected from a list of legal answers.

Each case also contains one or more actions. An action is a statement that indicates a solution to a computer problem. An action, however, may contain multiple steps necessary to perform the solution. Actions are not case specific and may be shared among multiple cases.

The cases within the knowledge database **114** are derived from knowledge held by experts having backgrounds in troubleshooting and maintaining computer system environments. Some areas of expertise represented in the knowledge database include WINDOWS 95 and hardware installation.



Of course, other areas of expertise can easily be represented. In addition, the cases **114** are customizable and easily updated.

Each case can have a confidence value. The confidence value of a case indicates the degree to which the tool **100** believes the case is relevant to the diagnosis of the computer problem. Likewise, questions and actions can have confidence values. For a question, the confidence value indicates the degree to which the tool **100** believes the question is relevant to the diagnosis. For an action, similarly, the confidence value represents the likelihood that that action is a solution to the computer problem.

The AI engine **116** is the portion of the tool **100** that actually processes the cases in the knowledge database **114**. The AI engine **116** is preferably an inference engine implementing both forward and backward chaining methods for determining possible solutions to the computer problem. One embodiment of the present invention uses the CBR2 inference engine from Inference Corporation (El Segundo, Calif.). However, any form of rule based AI engine, such as an expert system or neural net, could be used.

The AI engine **116** evaluates cases and adjust confidence levels of other cases, questions, and actions according to rules in the knowledge database. The rules answer questions based on data in the knowledge database. Rules answer text questions, for example, by matching specific words or phrases found in the answer with particular key words in the knowledge database. Once one or more questions have been answered, the rules may be able to use those answers to eliminate or answer other questions and adjust the confidence levels of other cases, actions, and questions.

The AI engine **116** uses the information supplied by the sensors **112** to evaluate the cases. If needed information has not already been collected by the sensors **112**, the AI engine **116** will activate the particular sensor capable of gathering the needed information. That sensor **112** will gather the information from the computer system **300** or computer user and place it in the knowledge database **114**.

FIG. **2** is a flow chart illustrating the process by which the present invention detects, identifies, and solves computer problems. At step **210**, the scheduler monitors the computer system **300**. At predetermined time intervals, the scheduler **110** activates various sensors **112** to determine the state of the computer system **300** and store relevant data in the knowledge database **114**. If a problem is detected by one of the sensors (step **212**), then the sensor **112** triggers the AI engine **116** to begin solving the problem.

At step **214**, the AI engine **116** runs the problem through the knowledge database **114**. This step involves evaluating a series of cases and questions. If the data necessary to evaluate a question are not known, then the AI engine **116** activates an appropriate query sensor to retrieve the data necessary to complete the evaluation. The result of each evaluation affects the confidence levels of certain other cases, questions, and actions. If the confidence level of a certain action rises above a predetermined threshold, say 85%, then that action is a likely solution (step **216**). Accordingly, the AI engine **116** directs the appropriate sensor **112** to perform the action (step **218**). If the sensor cannot perform the action by itself, the sensor **112** will tell the computer user to perform the action.

If no action rises above the threshold, then the AI engine **116** evaluates the case or question having the highest confidence level (step **220**). If more data is necessary to evaluate the case or question (step **222**), the AI engine **116** directs the appropriate sensor to gather the data (step **224**). At step **228**, the AI engine **116** evaluates the question or case and then returns to step **214**.

If the tool **100** has gathered all possible data and still does not have a solution to the computer problem, then the AI

engine **116** has failed to find a solution in the knowledge database **114**. This failure represents computer problem which is new to the tool. Accordingly, the tool **100** preferably saves the state of the computer system **300** and knowledge database **114** to a location where the state and database can be examined by a human computer expert (step **226**). Presumably, the human expert can then solve the computer problem and add the solution to the knowledge database **114**.

The invention has been described with reference to particular preferred embodiments, but variations within the spirit and scope of the invention will occur to those skilled in the art.

What is claimed is:

**1**. A tool for automatically maintaining a computer system having a processor and a memory, the tool comprising:

a knowledge database stored in the memory and holding a plurality of cases describing potential computer problems and corresponding likely solutions;

a plurality of sensors stored in the memory and executing on the processor and adapted for gathering data about the computer system, storing the data in the knowledge database, and detecting whether a computer problem exists from the data and the plurality of cases; and

an AI engine stored in the memory and executing on the processor in response to detection of a computer problem and utilizing the plurality of cases to determine a likely solution to the detected computer problem, wherein

when the knowledge database lacks data necessary to determine a likely solution to the computer problem, the AI engine activates a particular sensor in the plurality of sensors to gather the necessary data and store the data in the knowledge database, and wherein

when the knowledge database does not describe a likely solution to the computer problem, the AI engine saves the gathered data in the knowledge database as a new case.

**2**. The tool of claim **1**, wherein each case comprises:

at least one question asking about a particular aspect of the computer system that can be answered by the data gathered by the plurality of sensors; and

at least one action describing a likely solution to a potential computer problem stored in the knowledge database.

**3**. The tool of claim **2**, wherein the AI engine executes a particular sensor of the plurality of sensors to carry out a likely solution to the computer problem detected by the plurality of sensors.

**4**. The tool of claim **3**, wherein the particular sensor requests that a computer user carry out the likely solution to the computer problem.

**5**. The tool of claim **1**, wherein first selected ones of the plurality of sensors gather data about the computer system by observing the computer system and second selected ones of the plurality of sensors gather data about the computer system by requesting data from a computer user.

**6**. A method of optimizing a computer system, the method comprising the steps of:

detecting a problem in the computer system;

activating an AI engine in response to the problem detection;

utilizing, by the AI engine, selected ones of a plurality of sensors to gather information about the computer system;



determining, by the AI engine, a likely solution to the problem from the gathered information; and

when a likely solution cannot be determined, saving a state of the computer system.

**7**. The method of claim **6**, wherein the selected ones of the plurality of sensors gather information by requesting input from a computer user.

**8**. The method of claim **6**, wherein the determining step comprises the substeps of:

inferring the likely solution to the problem from questions, actions, and rules contained in a knowledge database; wherein

the AI engine utilizes the selected ones of the plurality of sensors to gather information when the knowledge database lacks information necessary to answer a question.

**9**. The method of claim **8**, wherein the AI engine uses forward chaining to infer the solution.

**10**. The method of claim **8**, wherein the AI engine uses backward chaining to infer the solution.

**11**. The method of claim **6**, wherein the AI engine is a case-based inference engine.

**12**. The method of claim **6**, further comprising the step of:

applying, by selected ones of the plurality of sensors, the likely solution to the computer system.

**13**. The method of claim **12**, wherein the applying step comprises the substep of:

requesting that a computer user apply the likely solution.

**14**. The method of claim **6**, wherein the detecting step comprises the steps of:

periodically activating selected ones of the plurality of sensors to gather information about the computer system; and

analyzing the information to determine whether a problem exists.

**15**. A program storage device readable by a computer system, the program storage device tangibly embodying a program of instructions executable by the computer system to perform method steps for automatically maintaining the computer system, the program storage device holding instructions for:

sensing information about the computer system by at least one sensor;

determining whether a computer problem exists from the sensed information;

searching a plurality of cases with the sensed information to determine whether a likely solution to the computer problem exists;

when additional information is needed to determine a likely solution to the computer problem, activating the at least one sensor to sense the additional information; and

when a likely solution to the computer problem does not exist, saving the sensed information as a new case of the plurality of cases.

**16**. The program storage device of claim **15**, wherein the at least one sensor senses information about the computer system by requesting information from a computer user.

**17**. The program storage device of claim **15**, wherein the sensing step comprises the substep of:

periodically activating the at least one sensor to gather information about the computer system.

* * * * *

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on September 6, 2016.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Eric A. Shumsky*
Eric A. Shumsky
*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 12,084 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Eric A. Shumsky*
Eric A. Shumsky
*Counsel for Appellants*